159 A.2d 596 (1960)
Alan L. McCLELLAND and Janet W. McClelland, Plaintiffs,
Robert C. Denzler and Grace Denzler, Intervening Plaintiffs,
v.
MAYOR AND COUNCIL OF WILMINGTON, a municipal corporation of the State of Delaware, Joseph S. Wilson, Ralph B. Richardson, Benjamin F. Shaw, II, comprising the Board of Harbor Commissioners, an agency of The Mayor and Council of Wilmington, and Bestwall Gypsum Company, a corporation of the State of Maryland, Defendants.
Court of Chancery of Delaware, New Castle.
March 10, 1960.
*597 Alexander L. Nichols, Harvey S. Kronfeld, Richard H. Allen of Morris, Nichols, Arsht & Tunnell, Wilmington, for plaintiffs.
Carroll F. Poole, Wilmington, for intervening plaintiffs.
Stewart Lynch, City Solicitor, Wilmington, for defendant, Mayor and Council of Wilmington.
John J. Morris, Jr. and Edmund D. Lyons of Morris, James, Hitchens & Williams, Wilmington, for defendant, Bd. of Harbor Commissioners.
William Poole, Frank O'Donnell, and Thomas G. Hughes of Berl, Potter & Anderson, Wilmington, for defendant, Bestwall Gypsum Co.
SEITZ, Chancellor.
This is a taxpayers' suit to enjoin the performance of certain agreements between the City of Wilmington ("City"), The Board of Harbor Commissioners ("Board") and the Bestwall Gypsum Co. ("Bestwall"). These agreements are concerned with the proposed erection of a gypsum plant on land located at the Marine Terminal ("Terminal").
The Terminal has facilities to handle ocean going vessels. It consists of approximately 139 acres of land acquired by purchase and 30 acres reclaimed by dredging operations. There are also about 100 acres of partially improved land. It has warehouses and miscellaneous facilities. A large warehouse is in the course of construction.
The Terminal was created by an Act of the General Assembly of Delaware in 1917 (29 Del.Laws, Chap. 123). The purpose of the original Act was to authorize the improvement of the then existing water front and to authorize the board and their successors to increase the harbor and shipping facilities of the City of Wilmington, on or adjacent to the banks or shore, as then existing or thereafter extended; or such part of the water front as the Board in its judgment might deem advisable, whether such water frontage was then owned by the City or others. The original Act also authorized the Board to acquire land and all other rights and privileges deemed necessary thereto. It was further authorized to construct, in addition to the wharves, piers, docks, bulkheads, slips and terminals, such other structures, including cranes, as the Board might determine for the convenience of shipping and commerce.
In 1925 the Harbor Board Act was amended to give the Board the power, inter alia, to lease its land or facilities if the Board deemed it to be to the advantage of the City to do so. (34 Del.Laws, Chap. 122). Shortly after 1925, the Board began the leasing of lands at the Terminal to private industry, where such leases could be profitably made for the City and where in the Board's judgment such leasing would increase the use of the harbor facilities.
The Board's policy was influenced by the highly competitive nature of harbor operations. The income from the lessees has clearly been important to the self-sufficient operation of the Terminal. The Marine Terminal is a so-called "out port" which does not have regular sailings and therefore at least 300 tons of cargo must be available for discharging or loading before a vessel will call at Wilmington.
*598 At the present time ten so-called long term leases of land are in effect, covering various portions of the Terminal land. I exclude the Bestwall lease. Their terms run for various periods but one of them with an option may not expire until 1991. The lessees use the land to store their property for various periods and purposes. All lessees appear to make use of the harbor facilities.
The Board has had a policy of not selling its land. Since about 1952, the public demand for the use of the Terminal has shown a rapidly rising trend.
In 1955, the Legislature enacted the Wilmington Marine Terminal Bond Act, 50 Del.Laws, Chap. 457. That Act authorized the issuance of either general obligation or revenue bonds for the improvement of the Terminal. The Act was amended on March 16, 1959, to broaden the definition of "undertakings" which could be financed by the issuance of bonds so as to authorize specifically the issuance of revenue bonds for the construction of manufacturing plants for sale or lease on Terminal land (52 Del. Laws, Chap. 4).
Before the Bestwall transaction was broached, the Board had embarked upon a campaign to have City Council authorize the erection of a new 1,000 foot dock extension to cost $3,500,000. The same was true of the installation of a heavy duty multiple purpose crane at an additional cost of $250,000.
On the basis of the existing revenue and the amount of money required for payment of the principal and interest on outstanding Terminal bonds plus those projected for the purpose of paying for the new warehouse and dock extension, the annual income will probably be about $100,000 short of the funds necessary to cover all changes. Plaintiffs insist, however, that the future revenue will be greater and that there is no showing that the Terminal needs the Bestwall project to remain self-supporting. Nevertheless, I shall assume the correctness of defendants' position, which points up the essentially monetary nature of the Bestwall transaction from the Board's viewpoint. As defendants say in their brief:
"The Board has recognized that business is done where there are facilities and if you do not have these facilities you do not attract business. Therefore, the Board believes that present and probable future public needs for increased port facilities at the Terminal require and will continue to require a great deal of construction and improvement. To help meet the needs for extension and expansion, the Board had to find a way to finance additional facilities."
Commencing in September 1958, extensive negotiations took place between the Board and Bestwall looking toward some lease agreement. The parties finally agreed upon a lease agreement which provided that the City was to issue revenue bonds and to use the proceeds to build a gypsum plant and then lease it to Bestwall for twenty-five years with the option in Bestwall to renew for an additional 15 years. Before this lease was executed the plaintiffs commenced this action. Thereafter that lease was cancelled.
In place of the cancelled lease Bestwall and the Board negotiated a so-called Interim Agreement and Lease on October 1, 1959. The parties also on the same date executed so-called alternate Leases, Trust Agreement and Crane Agreement. When plaintiffs learned of these new matters they filed a supplemental complaint attacking them. This is the decision after final hearing on the validity of these instruments.
The basic purpose of the Interim Agreement was to give Bestwall the right to go ahead with construction of the plant at its own expense pending the final determination of this litigation. In substance, the Interim Agreement and Lease leases 21.47 acres of land located at the Terminal approximately 900 feet from dockside, and authorizes Bestwall to construct thereon a main gypsum products manufacturing *599 building, and auxiliary buildings, including a dock-to-plant conveyor on a fixed easement across other Terminal land. It is then provided that if defendants prevail in this litigation, a certain trust agreement will be executed, revenue bonds will be marketed by the City and the proceeds will be used to pay Bestwall for the buildings. Title to the plant will then be conveyed to the City. Any excess cost is to be paid by Bestwall.
It is provided that if the Supreme Court determines that the basic undertaking is invalid, Bestwall will then have three options:
1. To complete construction and bear all costs and retain title to the buildings and execute the Exhibit B Lease on the terms specified for Option A. The right of renewal is also given.
2. To complete construction at its cost and transfer title to the buildings and execute the Exhibit B Lease on the terms specified for Option B; or
3. To abandon the project and remove everything above ground from the premises.
Under the Interim Agreement and Lease, an annual land rent of $20,000 is payable until construction of the plant is completed, at which time the rent is increased by an amount equal to and payable in lieu of what the annual City taxes would be on the improvements, determined on the basis of tax assessing practices and rates effective in each year throughout the term of the Agreement, plus taxes, if any, levied against the City because of its ownership of the land or the existence of the improvements. The rental will then amount to $72,080, or if County taxes are levied, an additional $8,820.
I turn now to plaintiffs' first contention which is as follows:
The Wilmington Marine Terminal Bond Act, 50 Del.Laws, Chap. 457, as amended by 52 Del.Laws, Chap. 4, is unconstitutional on its face in purporting to authorize the Board to construct with public funds on public land manufacturing and other industrial facilities to be sold or leased for exclusively private use.
I quote the so-called Wilmington Marine Terminal Bond Act of 1955 as amended in 1959 ("Bond Act") in pertinent part:
"Section 1. Short Title of Act
"This Act may be cited as `Wilmington Marine Terminal Bond Act'.
"Section 2. Definitions
"Whenever used in this Act, unless a different meaning clearly appears from the context:
"(a) The term `undertaking' shall mean wharves, piers, docks, ships, bulkheads, terminals, warehouses, structures, appliances, cranes, machinery, equipment, elevators, compresses, refrigeration storage plants, buildings, structures and facilities to be used in the manufacturing, processing, assembling, storing or handling of any agricultural or manufactured produce or produce of mining or industry which in the judgment of the board will result in the increased use of the harbor facilities of the municipality, tracks, rails, railways or railroad lines, or any part or combination thereof, used or useful in connection with the improvement of the water front, the harbor, terminal and shipping facilities of the municipality. Any undertaking may include other structures and any facilities needful for the convenient use of the same in the aid of commerce, including the dredging of approaches thereto, and the construction of roads, bridges and causeways necessary or useful in connection therewith and including any public utility facilities designed to supply public utility services to other parts of the undertaking or to the users of any of the facilities of the board. There may be included as part of any undertaking all apparatus, equipment *600 and machinery of every nature necessary or desirable for the full utilization of the undertaking. Nothing in the foregoing shall be construed to authorize the construction or maintenance of telephone and telegraph facilities which are normally owned by public utility companies.
"(b) The term `municipality' shall mean `The Mayor and Council of Wilmington,' a municipal corporation of the State of Delaware.
"(c) The term `governing body' shall mean `The Council' of `The Mayor and Council of Wilmington'.
"(d) The term `board' shall mean `Board of Harbor Commissioners' created under the authority of Chapter 123, Volume 29, Laws of Delaware, as amended.
"Section 3. Additional Powers of Municipality
"In addition to the powers which it may now have, the municipality shall have power under this Act:
"(a) To plan, construct, acquire, reconstruct, improve, better or extend any undertaking within or without the territorial boundaries of the municipality, or partially within or partially without the municipality, and to acquire lands or rights in land or water rights in connection therewith.
* * * * * *
"(f) Any buildings, structures or facilities acquired by the municipality hereunder which are to be utilized in the manufacturing, processing, assembling, storing or handling of any agricultural or manufactured produce or produce of mining or industry, which may be acquired for operation by a corporation, entity or persons other than the board, as distinguished from buildings, structures or facilities acquired by the municipality for operation by the board as harbor, terminal and allied facilities for the direct use of the public, shall be acquired and financed hereunder only if prior to the issuance of bonds therefor the municipality, acting through the board shall have entered into a lease or leases thereof or an agreement or agreements for the sale thereof pursuant to the terms of which the lessees or purchasers shall pay to the municipality such rentals or installment purchase payments, or both, as upon the basis of determinations and findings to be made by the board, will be fully sufficient to pay principal of and interest on the bonds issued for the financing thereof, to build up and maintain any reserves deemed by the board to be advisable in connection therewith, and to pay the cost of maintaining the buildings, structures and facilities in good repair and keeping them properly insured, unless the leases or agreements obligate the lessees or purchasers to pay for such insurance or maintenance. The board is granted full power and discretion to enter into any such agreements or leases as may in its judgment be desirable for the best interests of the municipality. Any such agreement or lease may provide that any surplus capacity of the buildings, structures or facilities which are the subject matter thereof may be utilized by and for the benefit of the general public, in which event such surplus capacity may be maintained or operated, or both, by either the board or by the lessee or purchaser under the lease or agreement, or in part by each, all as may be provided in the lease or agreement. Any undertaking may include in part one or more buildings, structures or facilities or combinations thereof to be leased or sold as provided in this paragraph, and in part other buildings, structures or facilities to be operated by the board, the revenues of the whole being allocated and pledged to the financing of the undertaking as a whole, and in such event the requirements of *601 this paragraph applicable to buildings, structures or facilities to be leased or sold shall be applicable only to the part of the undertaking which consists of the buildings, structures or facilities to be so leased or sold.
"Section 4. Authorization of Undertaking; Form and Content of Bonds
"* * * Nothing contained in this Act shall be so construed to prevent the execution of leases and agreements by the board for the lease or sale of all or any part of any undertaking, as long as it is expressly found by the board that the revenues to be derived from such lease or agreement, together with the other revenues of the undertaking, will be sufficient to carry out the requirements of Sections 9 and 10 of this Act.
* * * * * *
"Section 8. Bonds To Be Issued To Finance Undertaking.
"* * * It is hereby further determined and declared that the carrying out of the purposes of this act and the powers and duties imposed in the municipality, the governing authority and the board will constitute the performance of an essential governmental function of the municipality and of the State of Delaware, will promote the natural resources of the state and will benefit the inhabitants of the municipality and the state, * * *. The purposes to be effected by this Act are hereby expressly found and declared to be public uses for which public money may be spent and private property may be acquired by the exercise of the power of eminent domain."
In approaching the constitutional question presented, the court has in mind the presumption of constitutionality. The court is also aware that we are here concerned with revenue rather than general obligation bonds. While this distinction may make some difference in a "close" case (Compare 59 Col.Law Rev. 618, 632), the Supreme Court in the Ranken case, infra, which involved revenue bonds, did not accord that fact any recognized significance in applying the "public purpose" principles. Finally, the court realizes that the legislative finding of public purpose is entitled to great weight.
Plaintiffs properly distill the following legal principles from Wilmington Parking Authority v. Ranken, 34 Del. Ch. 439, 105 A.2d 614, 622; public funds may be employed only for public purposes; the public purpose must be the primary purpose of the expenditure and not incidental or subordinate; a "public purpose" is not susceptible of a precise definition in all cases; each case must turn on the particular object sought to be accomplished.
Plaintiffs then argue as follows: The Bond Act is concerned not with the use of public funds to construct harbor facilities as such but only with manufacturing facilities which will increase the use of the harbor facility; the underlying purpose of the Act is therefore to increase the City's income from its harbor operations; the other purposes, e. g., use of income, are incidental; the profit being primary, it is not a valid purpose and thus the statute is unconstitutional on its face.
Defendants contend that the Bestwall transaction serves a public purpose and will not primarily subserve the interests of Bestwall. Thus, the prime issue in the case is posed.
Although plaintiffs have argued that the Bond Act is unconstitutional on its face, I do not believe it can be so decided. I believe the issue is whether the statute is constitutionally applicable to the transaction under attack. My conclusion would seem to be warranted by the broad language of the Act, by the language of our Supreme Court in the Ranken case that "public purpose" problems must be resolved in the light of the particular object sought to be accomplished, and finally because *602 of the language of the Act that the inapplicability or invalidity of any section of the Act in any instance "shall not be taken to affect or prejudice in any way the applicability or invalidity in any other instances" (Sec. 9).
Thus, we must look to the facts to see whether the proposed action is constitutionally supported by the statute. It is conceded that the operation of the Terminal serves a public purpose. Does it follow that the Bestwall transaction subserves a similar purpose because its plant is to be located at the Terminal? Defendants contend that it will provide the following public purposes or benefits:
1. Revenues received therefrom are necessary to finance the badly needed new dock extension and warehouse.
2. The business of the port will be more diversified.
3. At the termination of the Bestwall tenancy, the City will get, without cost, valuable buildings and facilities.
4. Terminal land that is now swamp in part and under water in part will be filled in.
5. Expensive piling will be available for future use.
6. The Terminal will, under certain conditions (i. e., if the City builds the dock) have the use of the bulk ore crane for approximately 343 days per year.
7. It is part of the leasing program of the Terminal designed to encourage greater use of the port facilities.
While plaintiffs' attorneys challenge the factual basis for some of the defendants' contentions I shall assume that they are accurate and I shall also assume that they are all relevant under the various "purpose" provisions of the Act. Do they support the finding of a primary public purpose in the use of these funds to erect a plant for Bestwall?
In the Ranken case, which dealt with public parking facilities, our Supreme Court said:
"On the other hand, it is equally well settled that if the sole purpose, or the `primary purpose' of the project is private, and the public benefit incidental only, the project is unconstitutional. This rule is recognized in the cases above cited. See also State v. Town of North Miami, Fla., 59 So.2d 779 (erection and leasing of a manufacturing plant is unconstitutional); Opinion to the Governor, 76 R.I. 365, 70 A.2d 817 (statute authorizing leasing for commercial uses of entire project is unconstitutional; temporary leasing of a portion of the facility when not needed for public use is permitted)."
Our Supreme Court cited State v. Town of North Miami as representing a well settled view that the erection and leasing of a manufacturing plant is unconstitutional. It is interesting to note that since the Ranken opinion (1954), at least one jurisdiction has apparently reached a contrary conclusion, see City of Frostburg v. Jenkins, 215 Md. 9, 136 A.2d 852. Nevertheless, I am bound by our court's apparent approval of State v. Town of North Miami. A possible distinction between that case and the present one is the fact that this plant is to be erected on Terminal land which will increase the use of the harbor with resultant financial benefit to the City. As hereinafter noted, in my view the distinction lacks substance because of the primary purpose behind the leasing of the facility. Nor do I think the City of North Miami case turned on the absence of statutory authority. In any event, certainly the Opinion to the Governor, 76 R.I. 365, 70 A.2d 817, did not, and it is also persuasive authority against this particular project.
It is true that the quoted situation was not before the court in the Ranken case but the analysis was a considered one and the approach of our Supreme Court has impliedly been readopted recently by that court in Wilmington Parking Authority v. *603 Burton, Del., 157 A.2d 894, 900, where the court said, "We summed up our holding in the Ranken case in the following language * * *:
"`Since the dominant or underlying purpose of the contemplated project subserves a public use, commercial leasing of space therein for uses unrelated to the public use is permitted to the extent, and only to the extent, that such leasing is necessary and feasible to enable the Authority to finance the project.'"
Just what is the "contemplated project" here? If it is the Bestwall transaction alone then it clearly does not subserve a public use. If the plant is viewed as part of the Terminal project then under the Legislature purpose here stated, revenue bonds may be used for any project so long as it is believed that it will increase the use of the harbor facilities. I do not believe the purpose can be construed as broadly as the language might indicate. Rather, if possible, it must be read as being intended to be within the "public purpose" constitutional limitation. So viewed can it be said that the Bestwall transaction (insofar as it involves public money) is primarily to subserve a public purpose?
I think one may fairly infer from the language of the Ranken case that were this project unrelated to the Terminal, the Supreme Court would strike it down out of hand as lacking a primary public purpose. The crucial consideration then is whether the "benefits" sought by locating the Bestwall plant at the Terminal make the project primarily for a public purpose. This is frequently a matter of emphasis. Compare Randolph v. Wilmington Housing Authority, Del., 139 A.2d 476.
Certain it is that the use of the Terminal facilities will be increased by locating the Bestwall plant there. Ships will be coming there to deliver the raw materials needed by Bestwall. The other factors mentioned will also benefit the Terminal. However, the clear primary objective of the Bestwall transaction is to raise more revenue for the Terminal. The testimony of defendants' witnesses clearly supports this conclusion. Defendants emphasize again and again that this project is designed to make the Terminal self-sustaining. Assuming that this purpose does not necessarily invalidate this project, I am also satisfied that such a consideration does not automatically insulate the transaction from attack on the ground that it may not subserve a "public purpose". Thus, in the Ranken case our Supreme Court quoted with apparent approval the statement from a Court of Appeals of New York Opinion in Bush Terminal Co. v. City of New York, 282 N.Y. 306, 26 N.E.2d 269, 273, to the effect that a project constructed "primarily for revenue and only incidentally for terminal purposes" might offend the constitutional requirement. Other authorities suggest a similar conclusion where the primary purpose is monetary.
I think it clear from the evidence that the Board intended a "bigger and better" Marine Terminal and determined that this was a way to help finance it because the City would not do so. To accomplish these objectives they needed to obtain more business at the Terminal which would use their facilities. This would serve a two-fold purpose, increase the use of the port and as a consequence raise more revenue for the port to use to enlarge and expand its facilities.
Thus, the use of public money to pay for a plant for Bestwall to use to manufacture gypsum is sought to be justified in large part on the ground that it would result in increased revenues for the City and would provide the means for financing additional facilities without the Municipality having to spend its own money. Obviously, if this is said to be primarily to subserve a public purpose then here there is no limit on the City's use of revenue bonds except a determination by the Board that the project will increase the use of the harbor facilities. I do not believe the City's power is that broad.
*604 I conclude that the erection of a facility of the type here involved with public money is not calculated primarily to subserve a public purpose. I so conclude because I find that the primary purpose of the project is to raise revenue. I need not decide whether other types of facilities might call for a different conclusion. See e. g., North Carolina State Ports Authority v. First-Citizens Bank & Trust Co., 242 N.C. 416, 88 S.E.2d 109.
I shall not attempt to support my conclusion by a "parade of horrors" concerning the encroachment of government into the sphere of private industry. In any event, this case appears to be an attempted "wedding" of the two. I do say that in my view this project runs afoul of our Supreme Court's current expressions as to a proper public purpose for the use of public money. The cases cited by defendants, such as Sigman v. Brunswick Port Authority, 214 Ga. 332, 104 S.E.2d 476, are at variance with our Supreme Court's apparent views in this field and cannot be followed. Incidentally, one has difficulty finding any discussion of this problem in the majority opinion in the Sigman case.
I conclude that 50 Del.Laws, Chap. 457 as amended by 52 Del.Laws, Chap. 4, cannot constitutionally validate that portion of the Bestwall transaction which would require the City to use the proceeds from revenue bonds to erect or purchase the Bestwall facility. Other objections of plaintiffs need not be considered. Appropriate injunctive relief will be granted.
I next consider whether those portions of the Agreement can be upheld which provide that the Board merely leases land to Bestwall. 34 Del.Laws, Chap. 122, § 1(e) provides that the Board does, inter alia, have the following power:
"To lease any portion or portions of the land or facilities controlled by said Board, if it shall deem it to the advantage of the City so to do, under such terms and conditions and for such period or periods of time as said Board shall determine, subject, however, to the approval of The Council of The Mayor and Council of Wilmington."
If the invalidity of the bond issue aspect of the transaction is established by the Supreme Court of Delaware, then Bestwall would have to abandon the project or execute one of two leases. Under Option (A) Bestwall retains title to the structures under a lease of the land for 25 years with a renewal term of 15 years. The annual rental is $20,000 plus an amount equivalent to the city taxes on the plant and improvements and the equivalent of the county taxes if assessed. Under Option (B) Bestwall transfers title to the facility to the City, pays the $20,000 a year rental under a 25 year lease with a 15 year renewal. Bestwall has the right to sublet. It is subject to the Board's veto power and subject to Bestwall's continuing liability for its obligation under the lease.
Both the City and Bestwall have the right to assign but if Bestwall assigns it remains liable for its obligation under its lease. Bestwall may install a 600 ton an hour bulk ore crane and the Board may have the part time use thereof.
The question then is whether the Board had the right to lease the 21.47 acres to Bestwall under either of the options described.
Strangely enough, the court has not been referred to and has been unable to find a case which discusses whether or not the leasing of land by the City is generally subject to the "public purpose" requirement discussed in connection with the issuance of revenue bonds by the City. I assume that the land to be leased was acquired for the public purposes stated in the original Terminal Act. This being so, what use may the Board make of such land where, as here, there is a statute permitting it to lease its land? Plaintiffs say it can only be used for harbor purposes because it was acquired for those purposes. They equate "harbor purposes" with "public purposes" and conclude that the leasing of the land to Bestwall *605 for the purpose proposed would not be permissible.
I believe the approach to be adopted is found in Vol. III, Dillon, Municipal Corporations, (5th ed.), § 997 where it is said:
"* * * A city cannot, as landlord or lessor, make a lease of real estate owned by it which is held for public purposes, when the making of such lease is inconsistent with these purposes. But even in the case of lands held for public purposes, a city may lease the same for purposes which are not inconsistent with, but are germane to and in furtherance of the public uses for which the lands are held. But it would seem that a lease of lands held for public purposes is subject always to the paramount obligation of the municipality to devote it to these purposes; and if the use and occupation of the lands by the lessee at any time becomes inconsistent with and prevents the application of the lands to these purposes, the lessee cannot claim the right to hold them as against the obligation of the city to devote the lands to these purposes."
On the basis of the evidence in this cause I draw certain factual conclusions. There are 171 acres of improved land at the Terminal and there are 100 acres of partially improved land. At the time the Bestwall transaction was concluded 87 acres were not under lease and this excludes the land to be reclaimed. It also does not embrace the recently purchased 20 acres. It further appears that the Bestwall operation will not interfere with other uses of the harbor since in the judgment of the Board there will be ample land left for harbor purposes.
There are 21.47 acres to be leased consisting of about 15 acres of filled land and the balance in fast land. However, most of the filled land still will require pilings if it is to be used to support any substantial structure. In fact about two or three acres of such "filled" land are under water at high tide. It further appears that the Board has been unable to find any real use for the land to be leased to Bestwall. Of course, the lease will produce revenue for the Terminal. Bestwall may install a crane which will also be of value to the harbor and possibly to the Board. Valuable pilings will be installed by Bestwall costing several hundred thousand dollars. They will remain at the Terminal at the end of the lease. Valuable additional warehouse space may also be available at that date.
Since about 1925 the Board has been leasing land at the Terminal to private industry for uses consistent with the particular operations. The lessees use the harbor facilities. This leasing practice of many years standing is a somewhat persuasive practical construction of the statute when considered in the light of the policy of the Board in implementing the statute, viz., to lease to those using the harbor facilities.
I conclude that under the facts I have narrated the purpose of the lease of the land to Bestwall is germane to and in furtherance of the uses for which the lands are held even though its primary purpose is not a "public purpose" within the operation of the constitutional limitation as herein applied. Compare Harter v. City of San Jose, 141 Cal. 659, 75 P. 344.
Plaintiffs argue that the term of the lease, the amount of rent and the other provisions thereof are so unreasonable that this court should strike the lease down. This court will not under the present facts substitute its judgment for that of the admittedly independent Board, assuming that it has the power to do so.
I therefore conclude that insofar as the agreements between the City and Bestwall provide for the leasing of the land at the Terminal, such agreements are not contrary to the law under the circumstances here presented.
Present order on notice.