STATE OF DELAWARE v. GEORGE F. BROWN

(*November* 6, 1963.)

TERRY, C. J., and WOLCOTT and CAREY, J. J., sitting.

*E. Norman Veasey,* Chief Deputy Attorney General, and *G. Francis Autman, Jr.,* Deputy Attorney General, for the State.

*Louis L. Redding* for defendant.

Supreme Court of the State of Delaware.

TERRY, Chief Justice.

On June 12, 1963, defendant, a Negro, entered the premises of the Deer Park Hotel in Newark, Delaware, and requested service of food. The Deer Park Hotel is a privately owned establishment which provides food, drink, and lodging, but the restaurant is separate from the hotel facilities. The proprietor, relying upon 24 *Del. C.* Sec. 1501, requested the defendant to leave after denying him service solely because of his race, and, upon his refusal to leave, obtained a warrant for his arrest for violation of the criminal trespass statute of this State, 11 *Del. C.* § 871, which was executed by the Newark Police.

In order to secure a prompt disposition of the Constitutional questions presented, defendant agreed to the immediate filing of this matter in the Superior Court and joined with the Attorney General in petitioning that court to certify the following question to this court:

"May the Judiciary of this State constitutionally entertain a trespass prosecution against a person who is denied service and requested to leave (refusing to do so) a restaurant or other place of public accommodation, which denial of service and requested exclusion are based solely upon the ground that the defendant is colored without ascertainment of his offensiveness to the major part of the customers of the place of public accommodations and injury to business and which action the keeper of such public place of public accommodation is based solely upon the purported authority granted under 24 *Del. C.* Sec. 1501?"

The question so certified requires us to determine the correlative rights and duties of the owners of public accommodations who seek to deny service to patrons exclusively

upon racial grounds and of those patrons who refuse to leave such places upon request by the owner or proprietor. In addition, we are asked to determine whether or not the Judiciary of this State may constitutionally entertain a criminal trespass action against one who refuses to leave a place of public accommodation when such request to leave is predicated exclusively upon the ground that the patron is a Negro.

Included within these questions is a request that we determine the common law obligations of owners of places of public accommodation. At common law, the obligation of an innkeeper to serve the general public was materially different from the duties imposed upon owners of other places of public accommodation. The Attorney General argues that an exposition of this dichotomy is unnecessary since it is clear that defendant was not seeking lodging in the hotel section of the premises in question. However, since the question has been accepted for certification and because of the relationship between the common law and 24 *Del. C.* § 1501, discussed *infra,* we deem it necessary to delineate the common law rule.

At common law, an innkeeper was the subject of extensive regulation and legal disabilities. As stated in Halsbury's, Laws of England (3d Ed.), Sec. 938:

"An innkeeper, that is to say at the present day, a hotel proprietor in his capacity as an innkeeper, is bound by the common law or custom of the realm to receive and lodge in his inn all comers who are travellers and to entertain them at reasonable prices without any special or previous contract unless he has some reasonable ground of refusal." Accord: 29 Am.Jur., Innkeepers, Sec. 48.

It is clear, therefore, that at common law an innkeeper had a positive duty to receive all travellers who conducted themselves with propriety and had the ability

to pay for a meal and lodging. It is important, however, to note that this rule of non-discrimination was applied at common law only when an innkeeper-guest relationship arose. An inn or a hotel was defined as "an establishment held out by the proprietor as offering sleeping accommodations, and, if so required, food and drink, without special contract to any traveller presenting himself who appears able and willing to pay a reasonable sum for the services and facilities provided and who was in a fit state to be received." (Halsbury's, Laws of England (3d Ed.), Sec. 931.) To be considered a guest, the person was required to be in a transient status and not a resident of the locality immediately surrounding the inn. In addition, the patron must have requested service within the inn or hotel portion of the public facility; the privilege is not available to one who seeks service in a restaurant or tavern owned by the innkeeper but operated as a separate facility. See *R. v. Rymer* (1877), 2 Q.B.D. 136. It is true that the requirement that the guest be a traveller has been somewhat eroded in more modern cases considering the common law rule. See *Alpaugh v. Wolverton*, 184 Va. 943, 36 S.E.2d 906 (Ct. of Appl., 1946). Therefore, in the instant case, defendant would not come within the innkeeper-guest relationship, since service was not requested within the hotel portion of the Deer Park Hotel.

Apart from the above-cited limited category of public establishments, it is clear that at common law the owner of a restaurant or other place of public refreshment, amusement, or entertainment was free to select patrons upon any basis deemed satisfactory to him. See Halsbury's, Laws of England (3d Ed.), Sec. 941; 29 Am.Jur., Innkeepers, Sec. 9; *Alpaugh v. Wolverton*, cited supra; *Slack v. Atlantic White Tower System, Inc.*, 181 F.Supp. 124 (U.S.D.C.D.Md., 1960). As was stated in *State v. Avent,*

253 N.C. 580, 118 S.E.2d 47 (1961), vacated on other grounds, 373 U.S. 375, 83 S.Ct. 1311, 9 L.Ed.2d 97 (1963):

"In the absence of a statute forbidding discrimination based on race or color in restaurants, the rule is well established that an operator of a privately owned restaurant privately operated in a privately owned building has the right to select the clientele he will serve, and to make such selection based on color, race, or White people in company with Negroes or vice versa, if he so desires. He is not an innkeeper. This is the common law."

Having considered the requirements of the common law, we are called upon to construe 24 *Del. C.* § 1501, which provides:

"No keeper of an inn, tavern, hotel, or restaurant, or other place of public entertainment or refreshment of travelers, guests, or customers shall be obliged, by law, to furnish entertainment or refreshment to persons whose reception or entertainment by him would be offensive to the major part of his customers, and would injure his business."

"As used in this section, 'customers' includes all who have occasion for entertainment or refreshment."

Defendant argues that the purpose of this statute was the promulgation of a legislative policy favoring the exclusion of Negroes from places of public accommodations. If the statute is so construed, it must be declared an unconstitutional exercise of legislative power by this court. See *Turner v. City of Memphis*, 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962).

■ ■ . It is a basic rule of statutory construction, previously applied by the courts of this State, that the legislature is presumed to have acted within its constitutional powers. See *Delaware Steeplechase and Race Asso-*

*ciation v. Wise,* 2 Terry 587, 41 Del. 587, 27 A.2d 357 (1942) ; *McClelland v. Mayor and Council of Wilmington,* 159 A.2d 596 (Del.Ch., 1960) ; and 16 C.J.S. Constitutional Law, § 99. Accordingly, defendant has the burden of proof of showing the invalidity of the statute. See *Philadelphia, B. & W. R. Co. v. Mayor and Council of Wilmington,* 30 Del.Ch. 213, 57 A.2d 759 (1948).

In attempting to meet this burden, defendant does not cite any legislative history nor does he draw upon any words from the body of the statute. Reliance is placed upon the fact that the predecessor of the statute was passed in the Reconstruction Era following the Civil War and the opinion of two scholars who believe that the statute was designed to exclude Negroes from places of public accommodation.

We are of the opinion that such facts fall far short of the quantum of proof required to declare a statute invalid. This is especially true since the statute in question was re-enacted by the Legislature in 1953, and it is presumed that the Legislature considered any changes in constitutional law which had occurred subsequent to the passage of the original statute. See *Mayor and Council of Wilmington v. Saint Stanislaus Kostka Church,* 10 Terry 5, 49 Del. 5, 108 A.2d 581 (1954).

We are now called upon to determine whether or not the statute in question modifies the common law duty of an innkeeper to serve all guests who are orderly and in a position to pay for the requested services. It is true that statutes in derogation of the common law must be strictly construed. See 50 Am.Jur., Statutes, Sec. 402. However, we are required to give weight to all words used in a legislative enactment. We note that the Legislature has utilized both the words "inn" and "hotel." Both of the cited words were used by the common law to describe

that establishment which had a common law duty to serve all who entered as guests. See Halsbury's, Laws of England (3d Ed.), Sec. 931, 938. Accordingly, we hold that it was the intention of the Legislature to modify the common law rule requiring an innkeeper to serve all guests, by specifying a limited ground upon which service to a guest could be refused. Since the statute and not the common law is the only source of authority for the actions of an innkeeper in denying service, the terms of the statute thus furnish both the source and the limitation of that power. An innkeeper, therefore, may refuse service to a guest when, in his judgment, the service to such guest would be offensive to a majority of his customers and, accordingly, would injure his business.

With respect to owners of other places of public accommodation, entertainment, refreshment, and amusement, we hold that it was the intent and purpose of 24 *Del. C.* § 1501 to codify partially their common law right to choose whom they will serve. We hold, therefore, again applying the rule that statutes in derogation of the common law are to be strictly construed, that the Legislature, by enacting 24 *Del. C.* § 1501, did not intend to abrogate the common law right of an owner of a place of public accommodation, other than an inn, to select those patrons whom he will serve.

We specifically hold that this statute does not indicate a public policy favoring discrimination. Defendant, however, urges that the discriminatory purpose need not be apparent upon the face of the statute, citing *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). In Gomillion, the court merely allowed the petitioners to present *proof* upon the question of improper purpose and noted that the respondent had presented no countervailing evidence of a proper legislative design. In

the instant case, we have held that the defendant has failed to meet his burden of proof and also found that the purpose of the statute in question was the partial modification and codification of the common law rule.

■ ■ Having thus construed 24 *Del. C.* § 1501, we must now consider whether or not refusal of service and subsequent expulsion of a patron predicated upon either 24 *Del. C.* § 1501 or the common law is consistent with the requirements of constitutional law. Such a question, of necessity, involves consideration of the Fourteenth Amendment to the Federal Constitution. It is well settled by the terms of the Amendment itself that no state may constitutionally deny to any citizen the equal protection of the laws. It is equally well settled that a private act of discrimination is not prohibited by the Fourteenth Amendment. See Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883); *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); *Turner v. City of Memphis,* cited supra; *Peterson v. Greenville,* 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963).

■ It is equally well settled that a state may not escape the prohibitions of the Fourteenth Amendment by delegating a governmental function to an allegedly private instrumentality. See *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); and *Turner v. City of Memphis,* cited supra. Therefore, any owners or managers of places of public lodging, entertainment, or refreshment who, because of public ownership, financial support, or control, are within the rationale of the Burton decision may not constitutionally refuse service to patrons based upon racial classification.

■ ■ However, an entirely different problem is presented by the owner or operator of the typical private restaurant, hotel, or other place of public entertainment

or refreshment. It was such an establishment that refused service to defendant. It is our opinion that the decision of such owner or manager to exclude patrons based upon race or color, subject to the exceptions as noted, does not violate the prohibitions of the Fourteenth Amendment. At this juncture, we must note the decision of Judge Lynch in *Mitchell v. Delaware Alcoholic Beverage Control Commission,* (Superior Court, Del.) 193 A.2d 294 (1963). In deciding this case, the court held that no business licensed by the State could constitutionally refuse service to patrons because of a racial classification. In reaching this result, the court relied upon the dissenting opinion of Mr. Justice Harlan in the Civil Rights Case, cited supra. We merely note that until the Civil Rights Cases are expressly overruled by the Supreme Court of the United States, it is the duty of our inferior courts to apply Federal constitutional law as it is presently construed by the United States Supreme Court. The court's opinion was further based upon its holding that four Justices of the United States Supreme Court, in Burton, cited supra, had held 24 *Del. C.* § 1501 to be unconstitutional. With respect to this contention, only Mr. Justice Stewart was of this opinion. We are constrained to say that the sweeping opinion of the court in Mitchell that all licensees are state instrumentalities subject to the Fourteenth Amendment would erode and emasculate any distinction between private and public action. It has uniformly been held that the mere fact that a state licenses a business does not clothe the business with the public character required to render the Fourteenth Amendment applicable. See *Williams v. Howard Johnson's Restaurant,* 268 F.2d (4th Cir., 1959) ; *Madden v. Queens County Jockey Club, Inc.,* 296 N.Y. 249, 72 N.E.2d 697 (1947) ; cert, den., 332 U.S. 761, 68 S.Ct. 63, 92 L.Ed. 346; and *Slack v. Atlantic White Tower System,* cited supra. Some language from

the Mitchell decision can be construed as postulating a distinction between licenses granted to certain "privileged" businesses, such as those selling alcoholic beverages, and those licenses granted to more "general" businesses. Such a distinction has been rejected for purposes of implying the presence or absence of state action. See *Madden v. Queens County Jockey Club, Inc.*, cited supra.

Accordingly, we are of the opinion that, with the exceptions noted above, the owner or manager of a privately owned place of public accommodation, entertainment, or refreshment may constitutionally refuse service to patrons because of discrimination predicated upon a racial classification.

Once the decision to refuse service has been made, 24 *Del. C.* § 1501 is no longer relevant. That statute, as we have previously held, merely modifies and codifies the common law right of a private owner of public accommodation to choose his patron. If the patron then leaves, no further problem is presented. If, however, he refuses to leave, as did the defendant, the owner then must rely upon 11 *Del. C.* § 871, the criminal trespass statute of this State; expel the patron by force; or fail to enforce his right to select his patrons.

The question presented is whether the State may, at the request of a private owner of public accommodation, arrest, prosecute, and convict one who refuses to leave after being denied service because of his race and after being requested to leave by the owner. In other words, the question presented is whether judicial action expressed in this manner contravenes the requirements of the Fourteenth Amendment to the Federal Constitution.

Both parties, in considering this issue, rely heavily upon the recent cases of *Peterson v. Greenville*, cited supra, and *Lombard v. Louisiana*, 373 U.S. 267, 83 S.Ct. 1122, 10

L.Ed.2d 338. In Peterson, the court found that the State had acted unconstitutionally through its legislative branch, by the enactment of statutes requiring segregation in places of public accommodation. In Lombard, the court found unconstitutional State action by virtue of coercive discriminatory pronouncements by representatives of the executive branch of government. It appears obvious, therefore, that these decisions are not controlling upon the instant question, since the question presented, as previously stated, is one of judicial action. However, it is equally true that these decisions cannot be employed to support the action which is assailed here, since the court, in these decisions, expressly reserved this issue for later consideration.

We believe a proper disposition of this matter is controlled by *Shelley v. Kraemer,* cited supra, and *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586. Rehearing denied 346 U.S. 841, 74 S.Ct. 19, 98 L.Ed. 361. Shelley clearly established the principle that judicial action fostering racial discrimination contravenes the requirements of the Fourteenth Amendment. In Shelley, the court denied equitable relief to white property owners who wished to restrain a Negro purchaser from taking possession of property in violation of a common restrictive covenant. The court, in denying relief, stated:

(After citing previous cases.)

"These are not cases, as has been suggested, in which the States have merely abstained from action, leaving private individuals free to impose such discriminations as they see fit. Rather, these are cases in which the States have made available to such individuals the full coercive power of government to deny to petitioners, on the grounds of race or color, the enjoyment of property rights in premises which petitioners are willing and financially

able to acquire and which the grantors are willing to sell." (At Page 19 of 334 U.S., at page 845 of 68 S.Ct., 92 L.Ed. 1161)

It has been argued, however, that the Shelley rationale is inapplicable to the instant case, since the Shelley court was concerned with a voluntary acceptance by buyer and seller; whereas the instant case postulates an owner or proprietor who is unwilling to allow the Negro patron to remain on the premises. The validity of such a distinction, however, was substantially eroded by *Barrows v. Jackson*, cited supra. In Barrows, the court held that one white property owner could not recover damages from another white property owner for breach of a restrictive covenant. In denying relief, the court stated:

"To compel respondent to respond in damages would be for the State to punish her for her failure to perform her covenant to continue to discriminate against non-Caucasians in the use of her property. The result of that sanction by the State would be to encourage the use of restrictive covenants. To that extent, the State would act to put its sanction behind the covenants. If the State may thus punish respondent for her failure to carry out her covenant, she is coerced to continue to use her property in a discriminatory manner, which in essence is the purpose of the covenant." (At Page 254 of 346 U.S., at page 1033 of 73 S.Ct., 97 L.Ed. 1586.)

In the instant case, as in Barrows, judicial action by the State to prosecute and convict defendant for trespass would constitute an encouragement of the actions of the proprietor in excluding defendant upon racially discriminatory grounds. This the State cannot do. As we have previously held, the owner or proprietor of a place of public accommodation, with the exceptions noted, may not be compelled by the State to accept patrons who are

personally offensive to him or to his customers. It is equally true, therefore, that the State may not compel the Negro patron to leave the place of public accommodation. To do so would place the weight of State power behind the discriminatory action of the owner or proprietor.

Finally, we note the recent decision of the Supreme Court in *Turner v. City of Memphis,* cited supra. In that case, the restaurant in question interposed a state trespass statute, similar to the one now before this court, as a justification for its action in refusing service to a Negro patron. The court indicated that the state trespass statute would be relevant only if it reflected an affirmative state policy favoring discrimination. The court further noted that if the statute was so construed, it would be unconstitutional in light of *Burton v. Wilmington Parking Authority,* cited supra. In the instant case, the trespass statute, as applied, results in judicial sanction of a policy of racial discrimination. Therefore, just as the State, in Turner, may not enact a statute which supports racial discrimination, the courts may not apply a statute which results in the fostering of racial discrimination. Therefore, the argument advanced in snch cases as *State v. Avent,* cited supra, and *Griffin v. State,* 225 Md. 422, 171 A.2d 717 (1961), cert. granted 370 U.S. 935, 82 S.Ct. 1577, 8 L.Ed. 2d 805 (1962), that a trespass prosecution is merely a neutral framework for a vindication of a private property right is untenable. The State, by intervening on the side of private discrimination, cannot be considered to be acting in a neutral or indifferent manner.

The Attorney General then argues that if the State is disabled from prosecuting defendant for trespass, the owner or proprietor will have. only his common law right of self-help and, accordingly, violence will ensue. We are not disposed to dispute the validity of this argument that, in some cases, the proprietor, after failing in efforts at

voluntary persuasion, may be compelled to utilize violence to expel an unwelcome patron. However, the State may not act unconstitutionally merely to avoid a threat of violence. See *Watson v. City of Memphis*, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed. 2d 529 (1963). As was stated in *Buchanan v. Warley*, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149:

"Desirable as this is (avoidance of violence), and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the federal Constitution."

In summary, we therefore hold, first, with the exceptions noted, that the private actions of the owners or proprietors of a place of public accommodation in refusing service to a patron which are predicated upon racially discriminatory grounds do not contravene the requirements of the Fourteenth Amendment to the Federal Constitution. In so doing, we do not express any opinion upon the moral or ethical validity of such action. As stated in *State v. Cannon*, 5 Storey 587, 190 A.2d 514 (1963):

"Therefore, our answer to the question before us may not be taken in any sense as an expression of individual opinion of any or all of the members of this Court upon the broad policy question."

Secondly, we hold that such owner or proprietor may not call upon the State to assist him in enforcing his private policy of racial discrimination. If the State acts in such a manner, the judicial power would be placed behind and in favor of racial discrimination, and such action is forbidden by the Fourteenth Amendment.

The certified question is answered in the negative.

WOLCOTT, Justice (concurring).

I concur in the conclusion reached by the majority that the certified question should be answered in the negative, but for different reasons. In my opinion the majority has considered and decided questions not raised or permitted to be raised by the certification before us.

The process of certification under Rule 20 is intended to provide a speedy final determination of a question of law upon which the decision in a pending case depends and nothing more. It is not designed, nor intended, as a substitute for an appeal from a final disposition of a case. Yet, the majority, in my opinion, has transformed this certification into something in the nature of an appeal and has answered not only the question of law certified, but several additional questions of law not raised by the certification. This, I believe, to be an unfortunate expansion of the entire process of certification.

In my opinion, the actual question certified to us is susceptible of a short answer. Basically, the question, itself, and the undisputed facts related in the certification narrow themselves to this: May the proprietor of a restaurant, privately owned and operated, refuse service to a Negro solely because of his race and solely in reliance upon a State statute interpreted and believed by the proprietor to authorize such discrimination?

It is thus apparent that racial discrimination has taken place in reliance upon and under color of a statute of the State of Delaware. It does not serve to construe the statute, as the majority does, as neither authorizing nor requiring discrimination. The State through its Legislature has acted and, in reliance upon that act, a private person has discriminated solely upon racial grounds. These facts, it seems to me, would lead the Supreme Court of the United States to hold that Delaware has become involved in the act of discrimination "to a significant ex-

tent," and that, accordingly, the act is prohibited by the 14th Amendment. *Cf. Peterson v. Greenville,* 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323, and *Lombard v. Louisiana,* 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338. The act of discrimination being constitutionally prohibited, it follows that the State courts must dismiss a criminal trespass prosecution growing out of it.

The foregoing, in my opinion, answers fully the certified question. Accordingly, the further questions considered and decided by the majority are not necessary to the answer to the certified question, and should not have been considered and decided. To do so is to change the entire theory of certification of questions of law, and to leave in doubt for the future what, if any, limitations are imposed upon it.