BANK OF DELAWARE, a banking corporation of the State of Delaware, Trustee under the Will of Joseph P. Pyle, Plaintiff,

v.

David P. BUCKSON, Attorney General of the State of Delaware, Defendant.

Court of Chancery of Delaware.

New Castle.

June 17, 1969.

Henry N. Herndon, Jr., and Jay P. James, of Morris, James, Hitchens & Williams, Wilmington, for plaintiff.

Ruth M. Ferrell, Deputy Atty. Gen., for the Attorney General.

Richard F. Corroon, Wilmington, amicus curiae, and Michael D. Goldman, of Potter, Anderson & Corroon, Wilmington, on the brief.

DUFFY, Chancellor.

A complaint for instructions was filed by Bank of Delaware, trustee under the will of Dr. Joseph P. Pyle, who died on April 7, 1917.[1] The residuary clause of his will, dated February 13, 1914, provides in part as follows:

"Whereas the prosperity, stability and well being of any Community or State depends on the character and intelligence of its Citizens, and whereas I believe that the education, training and experience to be obtained by a course at one of our leading Colleges or Universities is calculated to broaden the mind, develop the character, and give to our young men a wider scope to their views of life, its duties and responsibilities, therefore I direct my said trustee, as soon as practicable after the death of the said Ella I. Smith aforesaid, to establish a series of *scholarships* to be known as the 'Dr. Joseph P. Pyle Scholarships,' for the benefit of the young men of Wilmington; the object being to provide each year for the maintenance and education of *one* young man at one of the leading Colleges or Universities of this Country, to the end that they may become men of character and capability, useful members of Society and creditable citizens.

"To carry out this purpose I direct my said Trustee to appoint a committee consisting of the principal of the Wilmington High School, the Chief Jus-

1. The Bank of Delaware is the successor to Equitable Guarantee and Trust Company.

tice of the State of Delaware, and the President of The Equitable Guarantee and Trust Company, the trustee aforesaid, and their successors in their respective offices, who shall receive the applications and decide the merits of the applicants for the scholarships.

"In the event of any one or all of the above named officials being unable or unwilling to serve, I nominate as alternates the following:—the President of Delaware College, the Chancellor of the State of Delaware and the Vice-President of The Equitable Guarantee and Trust Company, the president of Delaware College to take the place of the principal of the Wilmington High School, the Chancellor of the State of Delaware to take the place of the Chief Justice of the State of Delaware and the Vice-President of The Equitable Guarantee and Trust Company to take the place of the President of that Company.

"If at any time a committee of three cannot be obtained from the six persons named, I direct that my said trustee appoint such persons available to fill the vacancies, as may be in its judgment best qualified for the purpose. Applications may be made by white youths or young men residing in the City of Wilmington who shall have attained the age of seventeen years and whose age shall not exceed twenty-one years, who shall have graduated at the Wilmington High School or at any other school in the City of Wilmington at which young men are prepared for college.

" * * * In making its decision it is my wish that the Committee shall be governed not only by the proficiency of the applicant in Scholastic matters but by his physical condition, his fondness for manly out-of-door exercises, his moral force of character, his manhood, truth and courage and such qualities mental and physical as the possession of which, constitute a man of high character and condition."

Since its first meeting in 1933 the scholarship Committee has at all times been composed of successive Chief Justices of the State of Delaware, principals of Wilmington High School, and officers of the Bank of Delaware.[2] The Committee, carrying out what it considered to be the mandate of the trust, has accepted applications from white youths only; on at least one occasion a non-white applicant was rejected. Now the Trustee seeks instructions as to the effect to be given the language in the will providing that "Applications may be made by white youths or young men residing in the City of Wilmington." In short, the Trustee wants to know if applications from non-whites may be accepted.

The Trustee argues that the trust is not subject to the Fourteenth Amendment and that the restriction is valid.[3] The amicus attacks the restriction on two grounds. First, he argues that the scholarship and its administration violate the Equal Protection Clause of the Fourteenth Amendment. Alternatively, he contends that the doctrine of cy pres should be applied because continued enforcement of the restriction will impair the testator's primary purpose.

I

There are several facets of the case which have a particular significance.

2. The "Chancellor of the State of Delaware" is named as an alternate member of the Committee, but I do not regard this as a reason for disqualifying myself. I have never served on the Committee.

3. The Attorney General's answer recited that he takes no position in the matter, and an amicus curiae was therefore appointed by the Court. The amicus was ordered to file briefs and present argument in opposition to the validity of the restrictive provision, the Trustee was ordered to file briefs and present argument in support of its validity.

These are: (1) Dr. Pyle's intention as expressed in his will; (2) the impact on administration of the trust of the Fourteenth Amendment's prohibition against "state discrimination"; and (3) the changes in racial population since Dr. Pyle died. I should also note a limitation upon the Court in giving the instructions which the Trustee seeks. This is not determinative but it underscores the legal necessity for avoiding discriminatory action.

### A.

First, as to Dr. Pyle's will—who could doubt his intention to benefit this community? After small bequests to a few friends and relatives and provisions for modest life estates, he left his art collection to The Wilmington Society of the Fine Arts and the residue of his estate for the Pyle scholarships. I have no hesitancy saying as a matter of law that there is a general charitable purpose and intention in Dr. Pyle's will.

As to the scholarships, his language is both informative and instructive. He believed that the well-being of "any" community depends on the character and intelligence of "its Citizens," and he believed that a college education develops character and gives "young men" a wide view of life and its responsibilities. And this is no narrow view limited to one color group in the community. He then directed the establishment of a "series of *scholarships*" for the "benefit of the young men of Wilmington." His stated objective was to provide for the education of "*one* young man" at a leading college. He then provided with specificity and in detail for creation of the selection Committee. Thereafter, he directed that "Applications may be made by white youths or young men" living in Wilmington.

It is only in this one place, in this one word, that color or race is referred to in any way throughout the will. And even

here, whether as a result of careless draftsmanship or other reason, the reference is in the disjunctive: applications may be made by "white youths" *or* "young men" residing in Wilmington.

■ I need go on no further. These provisions of Dr. Pyle's will must be construed with due regard for the obvious motive which prompted him to create the scholarships. Compare Woodlen Brodnax, 30 Del.Ch. 227, 57 A.2d 752 (1948). And, in my judgment, that motive, the primary purpose of it all, was the creation of scholarships to benefit young men in the community. And the will establishes with almost equal persuasion an intention to have the selection of the young men made by a Committee, the majority of which would be persons holding important public offices.[4] The single reference to "white youths" must be read against this background of purpose.

### B.

Second, the Court must consider the current state of the law, particularly the Fourteenth Amendment as it relates to this trust. As I have said, the amicus argues that both the trust and its administration violates that Amendment. At minimum, he has demonstrated that on both counts the case presents a serious constitutional question. There are two views about whether "state action" is involved. But for present (instruction) purposes I do not have to make a definitive ruling on the constitutional question.

■ The sweep of the Fourteenth Amendment extends to all state action denying equal protection of the laws and that includes officers who exercise state powers. Cooper v. Aaron, 358 U.S. 1, 78 S. Ct. 1401, 3 L.Ed.2d 5 (1958). And state action is found wherever there is "state participation through any arrangement, management, funds or property." Burton

---

4. Only if the Trustee "cannot" get a committee from among the six named offices may it go to other persons. But without

255 A.2d—45½

doubt Dr. Pyle wanted the selections made by the Committee he named.

v. Wilmington Parking Authority, 365 U.
S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).
The fact that conduct is "formally private"
does not insulate it from the Amendment;
if it is "impregnated with a governmental
character" the Amendment applies. Evans
v. Newton, 382 U.S. 296, 86 S.Ct. 486,
15 L.Ed.2d 373 (1966).

It was *Evans* on which the District
Court relied in finding that the refusal to
admit Negroes to Girard College violated
the Federal constitution; and the Court of
Appeals affirmed on the same basis, thus
bringing that long controversy to an end.
Commonwealth of Pennsylvania v. Brown,
392 F.2d 120 (3 Cir. 1968). And it was
the decision in the Girard College case
which prompted the Trustee to seek in-
structions here.

In Quillory v. Administrators of the Tu-
lane University, 212 F.Supp. 674 (D.La.
1962) the Court, in discussing state action
where state officers were on Tulane's
Board of Trustees said, "Were the Tulane
Board made up solely of state officers,
without doubt there would be state action."
It went on to say that "If a principal can
be distilled from the Girard College case
it is that there is state action when state
officials are the sole trustee of private
funds."

In this case there is no fair compari-
son in fact between the deep involvement
of the City of Philadelphia in Girard Col-
lege and "state participation" in this trust.
But, three points can be made with assur-
ance about the Pyle trust and its adminis-
tration: (a) the membership of state offi-
cials on the Committee depends upon their
status as state officials; and (b) such
state officials constitute a majority of the
Committee; and (c) a reading of Dr.
Pyle's will fairly shows that he wanted
persons who are state officials (and only
while they serve as such) deeply involved
in the administration of the trust.

C.

The third significant point relates to
the change in the racial ratio in Wilming-
ton and its public schools since Dr. Pyle's
death. At the time Dr. Pyle executed his
will in 1914, approximately ten percent of
Wilmington's population was non-white.
Today approximately forty percent of the
City population is non-white, and it is still
going up. The percentage is even greater
in the public schools. Today approximate-
ly sixty-one percent of the students en-
rolled in grades ten through twelve of those
schools are non-white. And so if appli-
cations are limited to whites, this means
that more than half, 61%, of all indi-
viduals who might possess all qualifications
described by Dr. Pyle would be out. It
is of course true that there is no showing
in this record that it is impossible for
the Commitee to find a qualified applicant
from among the remaining 39% of the
students. But it is also true that the per-
centage of the population from which the
Committee may make its selection is vastly
more limited than it was in Dr. Pyle's
day, and that is a circumscription here
which he could not have visualized. The
population turnabout is dramatically, and
somewhat ironically, demonstrated by the
fact that one of the Committee members
(and a state official) whom Dr. Pyle spe-
cifically included, the principal of Wil-
mington High School is himself a Negro.

D.

The final point to which I have referred
relates to the limitation upon the Court
in giving instruction to the Trustee. And
this is like unto the second.

In Shelley v. Kraemer, 334 U.S. 1, 68
S.Ct. 836, 92 L.Ed. 1161 (1947) Chief Jus-
tice Vinson wrote:

"We hold that in granting judicial
enforcement of the restrictive agree-
ments [racial covenants in documents re-
lating to real property] in these cases,
the States have denied petitioners the

equal protection of the laws and that, therefore, the action of the state courts cannot stand."

And more recently Chief Justice Terry wrote for the Delaware Supreme Court in State v. Brown, 195 A.2d 379 (1963):

"We believe a proper disposition of this matter is controlled by Shelley v. Kraemer, cited supra, and Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586. Rehearing denied 346 U.S. 841, 74 S.Ct. 19, 98 L.Ed. 361. Shelley clearly established the principle that judicial action fostering racial discrimination contravenes the requirements of the Fourteenth Amendment. In Shelley, the court denied equitable relief to white property owners who wished to restrain a Negro purchaser from taking possession of property in violation of a common restrictive covenant * * *."

Compare Sweet Briar Institute v. Button, 280 F.Supp. 312 (W.D.Va.1967).

■ These rulings by the highest courts in our Country and State quite clearly limit this Court in what instructions it may give the Trustee. The short of it is that the Court may not advise the Trustee to reject applications from non-whites because such advice would amount to state (judicial) enforced discrimination in violation of the Fourteenth Amendment.

## II

The question before the Court is what instructions should be given to the Trustee in light of the facets of the case which I have outlined. This requires a consideration of the concepts and rules of law which are available to the Court under the circumstances.

The amicus contends that "cy pres" or "deviation" should be applied by the Court to Dr. Pyle's will. These two doctrines, cy pres and deviation, overlap to some extent. As to cy pres, the definition given in the Restatement of the Law, Trusts, § 399 (1935) was adopted by this Court in First National B. & T. Co. v. First National B. & T. Co., 35 Del.C. 449, 121 A.2d 296 (1956):

"If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail but the Court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settlor."

Deviation, on the other hand, is applied when compliance with a term is impossible or illegal or in changed circumstances. The definition is aptly stated in Restatement of the Law, Trusts (2 ed), § 381:

"The court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if it appears to the court that compliance is impossible or illegal, or that owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust."

The Restatement adds these comments:

"* * * The rule stated in this Section has to do with the powers and duties of the trustees of charitable trusts with respect to the administration of the trust; it has to do with the methods of accomplishing the purposes of the trust. The question of the extent to which the court will permit or direct the trustee to apply the trust property to charitable purposes other than the particular charitable purpose designated by the settlor where it is or becomes impossible or illegal or impracticable to carry out the particular purpose involves the doctrine of cy pres, which is dealt with in § 399."

"* * * The court will direct or permit the trustee of a charitable trust

to deviate from a term of the trust if owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust; and in such case, if necessary to carry out the purposes of the trust, the court may direct or permit the trustee to do acts which are not authorized or are forbidden by the terms of the trust. * * *"

In Bogert, Trust and Trustees (2 ed), § 394, it is stated:

"The court possesses a second important power, namely, that of changing, or permitting the trustees to change, the methods of administration set forth in the trust instrument, when this is deemed necessary or highly desirable in order to enable the trustee to perform the trust. This is called the power of the court to sanction deviation from the terms of the trust. The difference between this power and the cy pres power is not always observed by the courts. Sometimes an order which merely relieves the trustee of a handicapping limitation found in the trust instrument or merely permits the trustee to use funds to forward the original purposes of the trust in new ways, is called the use of cy pres; whereas in reality it is a departure from the prescribed methods of operation without in any way varying the end results which the donor envisaged. While the effects of using these two powers are similar, the procedure, formalities, and evidence required for the use of one power may be different from the requirements applying to the use of the other power. * * *"

And see Reed v. Eagleton, 384 S.W.2d 578 (Mo.Sup.Ct.1964).

In IV Scott on Trusts (3 ed), § 381, the deviation doctrine is stated as follows:

" * * * The courts will direct or permit a deviation from the terms of the trust where compliance is impossible or illegal, or where owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust. * *"

These authorities of law demonstrate beyond doubt that an equity court has the power to direct the trustee of a charitable trust to deviate or change from a trust term if, because of circumstances not known to the trustor and not anticipated by him, compliance would substantially impair the accomplishment of his purpose. This is sometimes described as cy pres, sometimes as deviation. But the label is not important. The power and its application are.

A number of cases have held that when a racial or religious restriction would make impractical the accomplishment of a testator's primary intention, the restriction will be removed. See, for example, In re Hawley's Estate, 32 Misc.2d 624, 223 N.Y.S.2d 803 (1961).

In Howard Savings Inst. of Newark v. Peep, 34 N.J. 494, 170 A.2d 39 (1961) the New Jersey Supreme Court gave effect to the primary intent of a testator to benefit Amherst College and eliminated a religious restriction so that the College would get the gift.

More recently, in Coffee v. William Marsh Rice University, 408 S.W.2d 269 (Tex.Civ.App.1966) the Court applied cy pres in eliminating a founder's racial restriction on University admissions; the Court found that the dominant purpose of the trustor was to establish a first-class institution and that was not possible "under present conditions" so long as discrimination remained.

There is also an English Chancery case which I want to particularly mention. It is In re Dominion Students' Hall Trust [1947] Ch. 183. There a charitable trust was set up to establish a hostel for male students of . European origin from overseas dominions. The trustee petitioned the

Court for permission to admit students of non-European origin and to eliminate the "colour bar." Although the Court determined that the restriction did not render the trust illegal or impossible, the petition was granted. The Court said:

"I have, however, to consider the primary intention of the charity. At the time when it came into being, the objects of promoting community of citizenship, culture and tradition among all members of the British Commonwealth of Nations might best have been attained by confining the Hall to members of the Empire of European origin. But times have changed, particularly as a result of the war; and it is said that to retain the condition, so far from furthering the charity's main object, might defeat it and would be liable to antagonize those students, both white and coloured, whose support and good will it is the purpose of the charity to sustain."

■ The fundamental rationale for applying cy pres or deviation is that accomplishment of the primary purpose of the testator is the matter of primary importance, and its achievement must be the object of any judicial permission to change or deviate from the trust terms. See Reed v. Eagleton, supra. And so it must be here.

### III

The Trustee seeks instructions. It is entitled to them. And, quite obviously, they should be meaningful and settle, to the extent reasonably possible, any doubt about how the Trustee should proceed. I conclude that the Court should apply the principle of deviation in framing a rule of procedure for the Trustee's guidance.

■ The short of it is that I am satisfied that the circumstances which now confront the Trustee are far different than they were when Dr. Pyle wrote his will, when it was probated and when the trust was established. I have already discussed the significant factors in some detail. Cumulatively the changed circumstances—the law which may now substantially affect the majority of the selection Committee which he created, and the enormous change in racial population of the schools—present a case for a change in administration of the trust. These are circumstances not known to Dr. Pyle and not anticipated by him. If a change is not made Dr. Pyle's primary purposes are likely to be defeated or substantially impaired. Those purposes are, selection from the community (for scholarship award) of a young man who best meets his specifications, the selection to be made by a Committee, the majority of which are public officers. Everything in Dr. Pyle's will indicates that he was more interested in getting the right man than he was in that man's color. And it is in keeping with that intention to remove the racial restriction.

For these reasons I conclude that in administering the trust, the Trustee should be instructed to accept and the Committee should be instructed to consider applications without limitation as to race. It is so ordered.[5]

---

5. At a convenient time counsel may submit a more definitive order.