## Treen Estate

*James R. Ledwith* and *George F. Shinehouse, Jr.*, for trustees.

*Spencer A. Manthorpe, Robert S. Taylor, Jr., Norman H. Brown, Christopher H. Gadsden*, and *Thomas H. Wright*, for charities.

*Morris Paul Baran*, amicus curiae.

*James W. Sutton, Jr.* and *David S. Molod*, for Commonwealth.

SILVERSTEIN, *J.*, May 31, 1979—Henrietta S. Treen died May 29, 1959, leaving a will dated December 21, 1951, which was duly probated. Under the terms of Item 29 of that will, testatrix provided, inter alia, that the residue of her estate be held in trust in a fund to be known as the "Henrietta S. Treen Fund in Memory of Ralph G. Treen," the purpose of which was to apply, annually, not less than 75 percent of the net income therefrom in perpetuity for the purpose of providing, in whole or

in part, the tuition and expenses of college or university courses "for deserving white Christian young men, at one or more of the following colleges or universities, the University of Pennsylvania, Temple University, Princeton University, Lafayette College and Lehigh University," and to devote annually such balance of the net income as may not be applied for scholarship assistance of the nature aforesaid "to a worthy and timely Christian charitable use, preferably for the benefit of persons living in the Philadelphia metropolitan area."

In this Item of her will, decedent provided for the establishment of a Committee, separate and apart from the trustees, to be appointed and perpetuated in the manner therein stipulated, one representing the trustees, one representing the Board of Trustees of the Presbyterian Church in Philadelphia, and two representing the above-named universities and college, in which she vested the exclusive authority to select those students to whom scholarship assistance is to be granted, as well as to determine the amount of financial aid which is to be awarded to the students chosen by it. Decedent further granted to this Committee the exclusive authority to determine such other worthy and timely Christian use alternatively described in another paragraph of this same Item of the will as "other urgent and worthy needs affecting the health and welfare of Christian people living in the Philadelphia metropolitan area" to which up to, but not in excess of, 25 percent of the net income from this trust may be applied annually, in the sole discretion of this Committee. The trustees applied the income from the trust in accordance with the testatrix's will from 1960 until the academic years 1969-70, at which time they suspended further distributions pending clarification of the provisions of the U.S. Tax Reform Act of

1969 and the determination of possible tax consequences on so-called "private foundations." In the meantime, this account was filed by reason of the death of Howard J. Lynch, one of the trustees, on December 19, 1971.

Additionally, questions have arisen from the administration of this trust which require adjudication.

(1) The Presbytery of Philadelphia of the United Presbyterian Church in the U.S.A. has indicated its unwillingness to appoint a representative to the selection committee because of its reluctance to engage in activities which it alleges involve the practice of discrimination based on race or religion.

Likewise the named universities and college have indicated their disinclination to join in appointing representatives to serve as members of this selection committee, because Federal and state statutes under which they receive various forms of grants and financial assistance prohibit them from discriminating with respect to their students.

Lastly, the accountants are reluctant to join in appointing such a representative to serve on this committee as this may jeopardize the tax exempt status of this trust.

The position of the universities and the college is unalterable and would not change should the Internal Revenue Service approve the continued charitable tax exemption of this trust.

The trustees would agree to proceed with the procedures set forth in the trust instrument if a favorable ruling was received that the nontaxable status of the trust would be preserved under the existing terms of the trust instrument.

It is interesting to note that on January 27, 1976, the Internal Revenue Service handed down its decision to the effect that the restrictions in the trust instrument do not affect the exempted tax status of the trust. However, this ruling is academic in view of the schools' stand.

The Commonwealth of Pennsylvania as parens patriae is opposed to the selection procedures of the subject trust. Additionally, it claims such transfer inheritance tax as may be due and assessed.

(2) The accountants propose that should the court decide to abandon the student selection committee concept in its entirety (a position in which it concurs) then the income be paid equally to the five educational institutions for scholarship assistance solely for the benefit of white Christian students or in the alternative, without any regard to the race or religion of the recipients.

The logical starting point in an effort to resolve the instant dilemma is the determination of the settlor's intent and in that regard the general rule is that such intent, if not unlawful, must prevail: Walton Estate, 409 Pa. 225, 186 A. 2d 32 (1962).

It is now hornbook law that testator's intention is the polestar in the construction of every will and that intention must be ascertained from the language and scheme of his entire will together with the surrounding facts and circumstances. See Walton Estate, supra.

Applying the above standards, the auditing judge concludes that settlor's intent was to benefit "deserving white Christian young men" rather than the named educational institutions. Cf. Schaaf Trust, 67 D. & C. 2d 163 (1974).

The language of the court in Weaver Trust, 43 D. & C. 2d 245, 251 (1967), under factual circumstances similar to the instant matter is particularly applicable:

"This is a private charity, capable of being lawfully administered by private trustees. As of the date of this writing, it is the settled law of this Commonwealth that a person has a right to donate his property for a lawful charitable use and have his disposition judicially respected and enforced; that to have the lawful limitations and restrictions imposed by him is a manifestation of the right of private property which is fundamental to our social, economic and political order; and that no person has a constitutionally protected civil right to become a beneficiary of a private charity in defiance of a donor's plainly expressed and legally valid restrictive provisions concerning race, creed or color." See also Girard Will Case, 386 Pa. 548, 127 A. 2d 287 (1956).

Based on these authorities, the auditing judge concludes that the subject trust is lawful. Unfortunately, this conclusion does not resolve the issue before the court, since private conduct abridging individual rights does not violate the Fourteenth Amendment "unless to some significant extent the State in any of its manifestations has been found to have become involved in it." Burton v. Wilmington Parking Authority, 365 U.S. 715, 722 (1961).

Thus, there is a substantial difference between the legality of a trust which is operating without court intervention and one that calls upon the court to change the machinery of a trust so that it can effectually operate.

The focal point is that portion of the Fourteenth Amendment to the United States Constitution which states: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Thus, two questions become obvious: (1) Is a decision by a court of a state such state action as would come within the meaning of the Fourteenth Amendment? (2) Can a court violate Fourteenth Amendment rights by enforcing a private agreement legal on its face?

In Shelley v. Kraemer, 334 U.S. 1, 14 (1948), the court stated: "That the action of state courts and judicial officers in their official capacities is to be regarded as action of the state within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this Court."

In Com. v. Brown, 392 F. 2d 120 (3d Cir. 1968), it was held that the Orphans' Court of Philadelphia had engaged in unconstitutional state action when it substituted individual trustees to carry out the racial restriction in Girard's will limiting admission to poor white male orphans.

Two Delaware cases had problems similar to that in the instant trust: Bank of Delaware v. Buckson, 255 A. 2d 710 (Del. Ch. 1969), and Milford Trust Co. v. Stabler, 301 A. 2d 534 (Del. Ch. 1973), both dealt with scholarships that had racial restrictions and permitted deviation.

Two great interests are here involved, both of which are of great importance to a civilized society.

The general freedom to dispose of one's property as one wants versus the government's duty as embodied in the Fourteenth Amendment to forbid religious, racial and sex prejudice. In the instant case the latter proposition prevails, because the court cannot act to enforce the racial and religious discrimination. Therefore, the Treen Trust cannot be enforced in its present posture.

By reason of these foregoing conclusions, we are now faced with a further perplexing problem, namely, what is to be done with the trust funds. The resolution of this problem depends upon the application of one of three alternatives, i.e., termination, cy pres or deviation.

Instructive on this issue is Weaver Trust, supra, wherein that court states at p. 250:

"The doctrine of cy pres is a judicial mechanism for the preservation of a charitable trust when accomplishment of the particular purpose of the trust becomes impossible, impracticable or illegal. Under such conditions, if the settlor manifested an intention to devote the trust to a charitable purpose more general than the frustrated purpose, the courts, instead of allowing the trust to fail, will apply the funds to a charitable purpose as nearly similar as possible to the particular purpose of the settlor. Very similar to, but distinct from, the principle of cy pres is the doctrine of deviation from the terms of a trust. The doctrine of deviation is applicable when compliance with an administrative provision of the trust is impossible, illegal or in conflict with the essential purpose of the trust. In such a situation, the court, pursuant to its general equity power, may allow modification of the provision. Essential to its application is a finding that the

term of the trust to be deviated from is an administrative one, so that it is not positively essential to the settlor's scheme. This finding is dependent upon an interpretation of the settlor's intent. Therefore, applicability of the doctrine of cy pres and the doctrine of deviation both depend upon the court's conclusion concerning what the settlor would have wanted to happen if he were aware of the contingency which has made the exact effectuation of his expressed intent impossible. See Restatement of Trusts 2d §§381 and 399."

Thus, it would appear that the doctrine of deviation is the appropriate remedy when compliance with an administrative provision by the trust is impossible, illegal or in conflict with the essential purpose of the trust.

This finding that compliance with an administrative provision of the trust is impossible brings into focus a further question and that is, the reason for its impossibility. As already stated, the selection committee refuses to operate because of their reluctance to engage in what they consider to be discriminating activities for fear of losing Federal and state subsidies. The elimination of racial and religious restrictions would satisfy the selection committee and the administrative procedure would then work. Thus, is this frustrated intent of the settlor within the orbit of a larger general intent. What then would the settlor want to happen if she was aware that her expressed intent could not be carried out? (See Weaver Trust, supra.)

Turning to the four corners of testatrix's will, we find nine pecuniary bequests in various sums to (11) Presbyterian Home for Widows and Single Woman located in Philadelphia; (12) Frankford Presbyterian Church; (13) Women's Missionary

Society of the Frankford Presbyterian Church; (14) Moody Bible Institute, Chicago, Illinois; (15) Northern Home for Poor Children in Philadelphia; (16) Philadelphia Home for Incurables; (19) Presbyterian Hospital of Philadelphia; (20) Frankford Hospital of Philadelphia; (21) Northeastern Hospital of Philadelphia.

Measured by these enumerated specific bequests we find no broad general intent to exclude women as beneficiaries. A portion of these bequests are made to women's societies in particular, while the others do not by any language preclude members of the female sex.

It would further appear that settlor's broad intent evidences a charitable scheme that transcends race since these charitable specific bequests are to institutions that benefit all races.

In only one crucial area of the will, i.e., page 10, provision 29, line 17, is the word "white" used, and that is in connection with scholarships. Significant in the analysis of this particular area are two separate paragraphs of this provision 29.

Paragraph 4, page 10, after directing the use of 75 percent of the trust income for scholarships provides: "So much of the net income of the fund in any annual accounting period as is not expended for the foregoing purpose shall be devoted to a worthy and timely Christian charitable use, preferably for the benefit of persons living in the Philadelphia metropolitan area."

The second paragraph of page 13 of this 29th provision of the will provides: "It is my further desire and intention that if in any year there are other urgent and worthy needs affecting the health or welfare of Christian people living in the Philadelphia metropolitan area, the Committee, in its discretion shall be authorized and empowered to apply

a portion of the income of the fund, but not in excess of Twenty-five (25%) per cent. thereof, to such other worthy charitable purposes."

This quoted language in no way precludes the use of trust income to charities that bestow benefits on non-Caucasians.

It is abundantly clear that testatrix used the word "Christian" to mean a person who adheres to the teachings of Jesus Christ as contrasted to the colloquial meaning used to describe one who lives a moral or righteous life. This is supported by provisions 11, 12, 13, 14, and 19 of the will, which relates to the aforementioned specific charitable bequests. This conclusion is supported by the two statements in provision 29, quoted above, "health or welfare of Christian people" and "devoted to a worthy and timely Christian charitable use."

A further provision of the will on page 13 contributes to this conclusion, to wit: "I desire that the Committee shall give special consideration to students who desire to prepare themselves for the Christian ministry, the practice of law, or the practice of medicine, . . ."

Thus, the auditing judge finds that testatrix's manifest intent as evidenced by her scheme of testamentary disposition gleaned from the four corners of her will is to benefit members of the Christian faith.

The auditing judge concludes that if this charitable settlor was aware of the inability to carry out her expressed intent, although disappointed, she would nevertheless recoil from a proposed termination of the trust. There emerges from the entire will, a broad scheme of charitable objectives, a predisposition to alleviate suffering, promote education, encourage a good moral life style and aid to the poor.

It is, therefore, the auditing judge's opinion that testatrix, being a charitable woman, would agree that the restriction of scholarships to "deserving white Christian young men" be stricken. She would, it is believed, act today in a manner consistent with the present social and legal climate.

Morris Paul Baran, Esq., was appointed by this court on June 25, 1973, amicus curiae with the powers of a master to assist the court in determining the issues herein presented. In his scholarly report, annexed, he concurs in these conclusions and recommends a deviation from the terms of the subject trust to the extent that reference is made to religion, race or sex.

Based upon the conclusions herein contained, it is directed that the trustees and the subordinate selection committee, which assists in the selection of the students for scholarships, eliminate every aspect of race, religion or sex from the criteria guiding them in the selection process.

We recognize that by this adjudication we are, as a result of legislative and judicial fiat, subverting the clearly expressed intent of the testatrix when we direct that the trustees and their subordinate selection committee eliminate "white Christian males," from the selection criteria. In order that no further injury be done to the memory of the testatrix, we direct the trustees to insure that those students selected by the selection committee have been selected solely on the basis of their scholastic record and intellectual achievements. We direct further that the colleges and universities whose students will be the beneficiaries of this trust, shall incorporate in their scholarship aid announcements that the only test for consideration of a grant will be the intellectual ability of the student as

demonstrated by his or her scholastic record and copies of such announcements will, as issued, be submitted to the trustees.

And now, May 31, 1979, the account is confirmed nisi.

## SUPPLEMENTAL ADJUDICATION

In my adjudication of May 31, 1979, I directed that those students selected by the selection committee be chosen solely on the basis of their scholastic record and intellectual achievements. This criterion was directed in order to preclude any consideration of race, religion or sex in the selection process. In amplification of that direction, my adjudication is hereby modified to permit the selection committee to consider financial need only when the scholastic record and intellectual achievements of the students under consideration are substantially equal, in which case the selection committee may take into consideration the relative financial need of such students.

And now, June 22, 1979, my adjudication dated May 31, 1979, is supplemented to the extent herein indicated; in all other respects to remain in full force and effect.