### In re ESTATE OF Eugene du PONT.

#### Civ. A. No. 13055.

Court of Chancery of Delaware,
New Castle County.

Submitted March 11, 1994.
Decided July 20, 1994.

---

OPINION

W. Donald Sparks, II, and John T. Dorsey, Richards, Layton & Finger, Wilmington, for The Medical Center of Delaware.

Clark W. Furlow, and Joanne M. Shalk, Smith, Katzenstein & Furlow, Wilmington, for Eugene du Pont, III.

Steven C. Blackmore, Deputy Attorney General, Department of Justice, Wilmington.

ALLEN, Chancellor.

In this action the Medical Center of Delaware, as the trustee of funds held under the will of the late Eugene du Pont, seeks judicial approval of a plan of expenditure of trust funds that is not expressly permitted or contemplated by the instrument under which it holds those funds. In making this request the Medical Center asserts that the expenditures that are expressly contemplated by the governing instruments are no longer practicable. It invokes the *cy pres* doctrine, as codified at 12 *Del. C.* § 3541, as support for its alternative proposal, which it claims will, in the changed circumstances that it currently faces, achieve the over-arching charitable intent of the donor of the funds involved.

The petition is resisted by both the Attorney General of the State of Delaware, who exercises a certain *ex officio* supervision over charitable trusts, and by Eugene du Pont, III, the son of the grantor.

I.

**A. A Series of Gifts To Create and Sustain the Eugene du Pont Memorial Hospital**

The two trust funds in question were created by two codicils to the will of Eugene du Pont which became effective with his death in 1954. Each of these funds was intended to assist in the realization of a larger purpose: the creation, construction, and operation of a convalescent hospital on land that had been occupied as the home of Mr. du Pont's mother, Amelia, on the outskirts of the City of Wilmington.

In 1951 Eugene du Pont and his wife, together with his sisters and the children of a deceased sister conveyed fee simple title to 9.85 acres of land, on the Kennett Pike to the Homeopathic Hospital Association of Delaware, its successors and assigns. The deed did not purport to restrict the Hospital Association's use of the property in any way, but both the grantors and the grantee shared the understanding that the property, known as "Pelleport", would be used for the construction of a convalescent hospital to be built in

memory of the parents of the donors of Pelleport, namely Eugene du Pont (1840–1902) and Amelia Elizabeth du Pont (1842–1917).

Eugene du Pont thereafter entered into two agreements with the Homeopathic Hospital Association to make possible the development of this hospital.[1] On December 20, 1951 he agreed that on or before January 31, 1954 he would transfer to the Association an aggregate of 5,000 shares of common stock of E.I. du Pont de Nemours & Company. In that agreement, the Association ("Donee") agrees:

> To cause to be erected one or more buildings on the property now known as "Pelleport" and recently conveyed by Donor and others to Donee to be used for the proper purposes of Donee, in such manner and for such period as the Board of Directors of Donee shall determine; *it being understood that the building or buildings when completed shall to such extent and for such period as the Board of Directors of Donee shall deem practicable and desirable, be utilized for convalescents and the treatment of convalescents.* (emphasis added)

A second agreement was entered into between Eugene du Pont and Homeopathic Hospital Association of Delaware dated January 13, 1953. In that agreement Mr. du Pont agreed that on or before January 31, 1954, he would assign and transfer to the Association an aggregate of 2,500 shares of the common stock of the du Pont Company and he agreed, as well:

> to expend an amount equal to the value of such stock as of the time the Donee shall receive it ... in connection with the erection, construction and/or equipment of one or more buildings on the property known as "Pelleport," which was conveyed by Donor and others to Donee to be used for the proper purposes of Donee, in such manner and for such period as the Board of Directors of Donee shall determine; it being understood that such building or buildings when completed shall, to such extent and for such period as the Board of Directors of Donee shall deem practicable and desirable, be utilized for convalescents and the treatment of convalescents.

Eugene du Pont died on December 15, 1954. His will contained several codicils that made gifts of additional funds to the Homeopathic Association to support the work of building and operating the Eugene and Amelia du Pont Memorial Hospital. The two trust funds presently at issue were created by the second and sixth codicils to the will of Eugene du Pont. They are an endowment fund to support the operations of the hospital and a building fund to provide for maintenance, improvement or additions to buildings at Pelleport.[2]

More specifically, the second codicil bequeathed 10,000 shares of common stock of E.I. du Pont de Nemours & Company to the Homeopathic Hospital, as a permanent endowment:

1. The Homeopathic Hospital Association of Delaware was a corporation formed by persons sympathetic to the teachings and practices of homeopathy, a movement of physicians, founded by Samuel Hahnemann, that followed "an abstruse philosophical doctrine ... [that encouraged a more sensitive] relationship between doctor and patient." Paul Starr, *The Social Transformation of American Medicine* at 96, 97 (1982). The homeopathic movement started and waned in the 19th century. The Delaware State Homeopathic Medical Society was organized in Wilmington in 1874. The Homeopathic Hospital Association of Delaware operated the Homeopathic Hospital starting in the 1880s; the name of the hospital was changed to the Memorial Hospital in 1940. By that time, and indeed for most of the twentieth century, the claims to a distinctive homeopathic medical practice had largely evaporated. Homeopathic and allopathic physicians practiced under a single licensing arrangement and were all members of the Medical Society of Delaware. *See* Lewis B. Flinn, *Homeopathic Influence In the Delaware Community: A Retrospective Reassessment*, 48 Del.Med.J. 418 (1976). The Memorial Hospital (and I assume the Homeopathic Hospital Association of Delaware) ceased to exist as a separate legal entity in 1965 with the merger of three local hospitals to form the Wilmington Medical Center. The hospital then known as the Memorial Division was later closed and its building demolished.

2. In addition to these testamentary gifts, in his third codicil Mr. du Pont gave an additional $500,000, if it were necessary to complete construction of the memorial and in the fifth codicil increased that amount to $700,000.

to hold said shares and any and all additions thereto ... as a permanent endowment; to collect and receive the income therefrom arising; to use one-half of that income to reduce what would be the proper normal charge for a room or rooms to patients (in like manner as if I were personally paying such portion of the proper normal charge therefore) at the Convalescent Hospital about to be erected by said Association at Pelleport (my ancestral home on the Kennett Pike near Wilmington, Delaware) for the construction of which I am giving to said Association from time to time the cost thereof; and to use the remaining one-half of said income for the proper maintenance and reasonable expense of operation of said convalescent hospital—all to the end that patients may have the benefits of such hospital at a cost less than they otherwise could.

As of September 30, 1993, the endowment fund had a fair market value of $5,531,000.00.

In his sixth codicil dated July 16, 1954, Eugene du Pont recited as follows:

The rapid increase in the population of New Castle County in this State has brought to me a realization that in the years to come increased facilities for the care of convalescent patients in this county will be direly needed.

Consequently, I give and bequeath unto Homeopathic Hospital Association of Delaware the sum of five hundred thousand dollars ($500,000) to be paid to it by my Executors in shares of the common capital stock of E.I. du Pont de Nemours & Company ...

The shares given in the sixth codicil were directed to be held for a period of ten years and the income thereon accumulated and reinvested in shares in the du Pont Company common stock. At the termination of that period:

[T]he Board of Trustees of the said Homeopathic Hospital Association of Delaware shall decide, after consulting with the trustees of my residuary estate, that an additional building or buildings at Pelleport should be built, the aforesaid Endowment Fund, both principal and accumulat-

ed income, may then be expended in whole or in part for that purpose.

Any income received from said endowment fund after the termination of the said ten-year period may be applied towards maintenance of the hospital for convalescent patients at Pelleport or may be accumulated for later construction of a building or buildings at Pelleport as the said Board of Trustees may decide after consultation with the Trustees of my residuary estate.

Any additional building or buildings erected in whole or in part at any time out of this bequest shall be harmonious in external appearance and structure with the building now being erected at Pelleport and so located as not to mar the setting or appearance of the building now being there erected.

As of September 30, 1993 the fair market value of the building fund was $6,900,000.00.

In due course, the construction of the Eugene and Amelia du Pont Memorial Hospital at Pelleport was completed and it has served the residents of this State for almost 40 years.

In 1992 the Delaware Medical Center, Inc. which had succeeded to the rights and obligations of the Homeopathic Hospital Association of Delaware, moved its convalescent care facility from Pelleport to its Wilmington Hospital facility and in effect closed Pelleport.

## B. Changes in Nature of Convalescent Care Provided at Pelleport

When the convalescent hospital was first constructed at Pelleport in the 1950s, it provided services quite different, and to a somewhat different patient population, than it provided by the time of its move to Wilmington Hospital in 1992. In the 1950s, convalescent hospitals served a patient population that for the most part, had recovered from the acute phase of an illness or condition, and simply needed a quiet location with minimum medical care while they recovered full health. These patients were infrequently wheelchair bound, and did not often suffer acute crises requiring the facilities of a fully staffed hospital.

By the 1980s the role of inpatient convalescent hospitals changed. The primary force

behind these changes were economic. Medicare, the government financed health program for the elderly, began to play an increasingly significant role as a third party payor of hospital bills. Medicare instituted a system of compensation—the Diagnostic Related Grouping ("DRG")—which provided a flat fee for a single treatment event, regardless of the duration and expense of the particular treatment. Under such a system, hospitals have a powerful economic incentive to move patients out of the hospital to less intensive facilities, in order to reduce costs. One means to do this is to move patients out of high cost hospital into lower cost rehabilitation facilities.[3]

As a result of these changes, convalescent hospitals tended to receive a "sicker" patient population, in need of more intensive services. Convalescent hospitals such as Pelleport changed their role to service the needs of these more unstable patients, and became, essentially, rehabilitation facilities. Substantially more patients utilized wheelchairs than previously, and there was a greater need for critical care services as well as other medical services—x-rays, laboratory work—which Pelleport had not originally been designed to provide. Pelleport apparently encountered difficulties in servicing this new patient population.

## C. Pelleport's Problems in Serving as a Rehabilitation Hospital

### (1) Lack of Wheelchair Access.

One consequence of the transformation of Pelleport to a rehabilitation facility was the increasing percentage of its population who were wheelchair bound.[4] This presented both practical and legal problems to the Medical Center. Practically, the rooms at Pelleport, in particular the bathrooms, had doorways that did not provide adequate clearance for these patients. Dr. Bertram Greenspun, the Medical Director of the Medical Center's rehabilitation services testified that it was often difficult, if not impossible, for nurses or therapists to provide assistance in the bathrooms to those patients who required it. The configuration of the building also interfered with the hospital's efforts to develop patients' independent living skills.[5] In addition to these clinical problems, the failure to provide adequate wheelchair access was said to have rendered Pelleport in violation of provisions of the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213.[6]

### (2) Absence of Critical Care Facilities.

Having a sicker patient population, among other things, implied increased risk of patients suffering a cardiac arrest and requiring emergency treatment. At a fully staffed hospital, a "Code Blue" team, consisting of several physicians, and therapists, would always be on call to provide advanced life support services. Over its forty year life Pelleport had never formed a Code Blue team, because its patient population (which averaged between 30–40) made it uneconomical to do so. It therefore relied upon ambulance rescue squads (obtained by calling 911) to provide advanced life support. The aver-

---

**3.** Mr. Caldas, the executive vice president of the Medical Center, testified that Medicare's system of compensation also incentivized the transfer of patients to rehabilitation facilities by reimbursing for rehabilitation services separately. That is, the hospital would receive compensation for rehabilitation services in addition to that provided as a flat fee (under the DRG system) for the prior treatment. I do not discuss these economic incentives in any greater detail, because for reasons set forth herein, the central legal issues raised by the petition are not materially affected by them.

**4.** Indeed, Mr. Caldas testified that at the time of the move to Wilmington Hospital, the patient population at Pelleport was "almost completely wheelchair-bound."

**5.** Mr. Caldas testified that the lack of wheelchair accessibility in the bedrooms and bathrooms was a severe problem: "This was such an integral part of the service we were providing the patients that it was a wholly unacceptable situation."

**6.** The lack of wheelchair access also posed a threat to Pelleport's continuing accreditation as a licensed rehabilitation hospital. The Medical Center was cited several times by the Joint Commission on the Accreditation of Healthcare Organizations for its failure to provide adequate wheelchair access. Due to this failure, Pelleport was granted only provisional accreditation.

age wait for such services was approximately 10–15 minutes. In recent years, Pelleport has experienced approximately one to two cardiac arrests per month.

(3) Absence of Clinical Diagnostic Services.

Due principally to its relatively small patient population, it also was not economically practical for the Medical Center to maintain radiological or laboratory services at Pelleport itself. Patients requiring such services were transported to Wilmington Hospital from Pelleport to have tests performed. This created additional expense and delay in the treatment of patients at Pelleport.[7]

## D. The Decision to Relocate the Rehabilitation Hospital from Pelleport to Wilmington Hospital

The Board of Directors of the Medical Center perceived that the Medical Center had two options with respect to its provision of rehabilitation services. Pelleport could possibly be renovated to make it an adequate treatment facility, or the provision of rehabilitation services could be relocated to the Wilmington Hospital, where space was available that could be fitted for this purpose.

(1) Costs of Renovating Pelleport.

In 1987, E.F. Dunbar, a planning architect for the Medical Center, prepared an analysis of the costs of renovating Pelleport. Mr. Dunbar concluded that it would be impossible to transform Pelleport into a "state of the art" facility without constructing a new facility on the property in addition to renovating the older one. His 1987 analysis therefore considered two different proposals for renovating Pelleport, each of which included a new building for the site. The first alternative included plans to construct a ten bed

intensive treatment unit, while the second did not. Otherwise, each proposal contemplated constructing a facility that would satisfy all regulatory requirements as well as provide more effective care for the patients at Pelleport. They both contemplated building a new facility containing two thirty bed nursing units as well as centers for physical and occupational therapy.[8] They each also contemplated the renovation of the existing building to provide other rehabilitative services.

The estimated costs of the new construction required by each proposal were $5.5 million for the less elaborate plan and $6.5 million for the plan which included the intensive treatment unit. In addition to these new construction costs, the study included costs for renovation and alteration of the existing facility, which increased the estimated outlay to $5.9 and $7.8 million, respectively. While the 1987 study did not reflect the additional costs of project costs including engineering and legal fees, Mr. Dunbar testified that the usual scope of these costs is within 30–40% of the construction costs.[9] Thus, the total estimated cost of the project, in 1987 dollars, was between $8–10 million, depending on the plan selected.

(2) The Proposal to Transfer Rehabilitation Services to Wilmington Hospital.

The Medical Center's consideration of relocating the rehabilitation center to Wilmington Hospital is reflected in two documents: a "Strategic Plan" for the Medical Center issued in July 1990, and a document entitled "Proposal to Relocate Rehabilitation Services to Wilmington Hospital." The former document reflected the institution's vision for the role its three hospitals would play in the rapidly changing market for medical care

---

7. In addition to these problems, Pelleport was burdened with other structural deficiencies giving rise to regulatory violations. For example, Pelleport was in violation of certain fire codes due to the excessive length of certain dead end corridors on the premises, and the inadequate width of certain exit routes. The presence of exposed steel beams at the facility, as well as the absence of a complete sprinkler system, also violated fire and life safety codes.

8. The less expensive facility was contemplated to occupy 55,600 square feet, the more costly one 65,600 square feet.

9. The costs of specific services contemplated by the term Project Costs were not particularized until September 1993, when Mr. Dunbar was asked to do so by Mr. Caldas in connection with this litigation.

providers. The latter dealt specifically with the plan to relocate the rehabilitation center.

### (a) The Strategic Plan

This document forecasts the future economic environment within which the Medical Center anticipates it must function. It outlined ways and means by which the Medical Center could improve its financial strength, as well as improve its capacity to provide high quality health care services to communities in Delaware. In furtherance of these objectives, the plan outlined, *inter alia,* its goal to expand the use of the Wilmington Hospital, whose daily patient population, it noted, was declining.[10] One contemplated way to do so was to relocate rehabilitation services from Pelleport to the Wilmington Hospital. The strategic plan proposed that this step be taken.

### (b) The Relocation Proposal

This proposal was set forth in detail in the October 4, 1990 "Proposal to Relocate Inpatient Rehabilitation Services to Wilmington Hospital." Specifically, the Medical Center management proposed investing $5.5 million to develop inpatient rehabilitation facilities on the 6th floor of the Wilmington Hospital. The contemplated facilities would consist of 46 beds.

The proposal contemplated that both financial and medical benefits would flow from its implementation. Medically, it claimed that relocating to Wilmington Hospital would improve "the quality and effectiveness of service to the Medical Center's patients requiring inpatient rehabilitation therapy." Specifically, the rehabilitation facility would be integrated into a full-service hospital. Wheelchair bound patients would be able to function more effectively in this environment. A more extensive facility for helping patients to integrate themselves into normal activities they would conduct once released from the hospital would also be provided.

Financially, in addition to general improvement of operating efficiency stemming from consolidation, the proposal contemplated that it would put the Medical Center in the position to improve its efficiency by allowing it to move patients from its acute care facilities earlier. In moving the rehabilitation facility, the Medical Center might also be permitted under the Medicare guidelines to recalculate the "historical" costs associated with providing such care. As a result of this change, Medicare reimbursement would increase by an estimated $668,000 in the first year. It was forecast that relocating the rehabilitation clinic to this more efficient location would allow the Medical Center to claim a greater percentage of the expanding market for rehabilitation services. Finally, the study noted that the relocation would allow the Medical Center to fulfill the objective of its strategic plan of increasing the occupancy at Wilmington Hospital. Based upon the estimated cost of $5.5 million, the proposal calculated the anticipated benefits of the move as generating a 9.4% return on the investment, for a 5 year period.

The proposal also analyzed the possibility of renovating Pelleport. It apparently adopted Mr. Dunbar's conclusion that this project would require developing a new building as well as renovating the existing facility.[11] It also adopted Mr. Dunbar's cost estimate that the project would cost in the range of $8–10 million dollars. Such construction, it noted would require zoning approval since the site was zoned only for residential development.

### E. Alternative Uses for Pelleport

In July 1992, the Medical Center relocated its inpatient rehabilitation center from Pelleport to Wilmington Hospital. It has considered several proposals for types of services the Medical Center could provide at Pelleport. One proposal was for outpatient, "ambulatory" rehabilitation services; another was for "medical adult daycare." Finally,

---

**10.** Increasing the use of the Wilmington Hospital would help offset the substantial fixed costs associated with the facility.

**11.** However, the proposal only considered construction of a 40,000 square foot building, not

the 55,000–65,000 square foot range contemplated by Mr. Dunbar. The proposal apparently adopted Mr. Dunbar's preliminary cost estimates.

the Medical Center considered a proposal to make Pelleport an in-patient drug and alcohol treatment center. None of these proposals has been adopted, however, and the future status of the property and building of Pelleport remains uncertain.

## II.

In this proceeding the Medical Center seeks judicial approval of its expending funds from the Endowment Fund established by the second codicil of Mr. du Pont's will to support the operation of the rehabilitative services that it now provides, not at Pelleport but at the Wilmington Hospital facility. It also seeks a declaration that it is empowered to expend funds from the Building Fund established by the sixth codicil for unspecified building modifications at Pelleport to fit that facility for another use.

The Medical Center asserts that it has become "impossible or impractical" to fulfill Eugene du Pont's intention that the trust funds be used to run a convalescent facility at Pelleport. Under 12 *Del.C.* § 3541, where a charitable trust "becomes ... impracticable of fulfillment ..." this court is specifically empowered to order "the administration of the trust for such charitable purpose, or the distribution of the trust to such charitable entity, *as fulfills as nearly as possible*, the intention of the trust's creator...."

It is the Medical Center's contention that using the Endowment Fund to support at the Wilmington Hospital the same type of rehabilitation services formerly provided at Pelleport, constitutes that close approximation of the settlor's original intent. Likewise, the Medical Center contends that using the Building Fund to support any new construction or renovation that might be necessary to facilitate the as yet undetermined role Pelleport will play, will best advance the donor's goal of maintaining his family's ancestral home as a place for community benefit.

Eugene du Pont III and the Delaware Attorney General oppose this application. They contend that the Medical Center has not shown that the costs of renovating Pelleport to allow it to provide high quality, inpatient rehabilitation services are such, relative to the resources available, to make that original plan impossible or impractical. They contend that the true motive for moving to Wilmington Hospital was simply increased profitability. While not denying that economic concerns are legitimate, the objectors nevertheless assert that they do not provide a legal basis for defeating the specific charitable intent of the testator.

In all events, the objectors assert that applying trust funds to the Wilmington Hospital would not fulfill "as nearly as possible" the intent of Eugene du Pont. They contend that Eugene du Pont's primary intent was that his mother's home be the locus of a convalescent care facility, not that convalescent care be supported in general. Thus, they contend that the Medical Center should only be allowed to use the trust funds to support one of the other proposed convalescent facilities at Pelleport. And, if no such convalescent facility is possible, they ask that the court order that the funds become a part of the testator's residuary estate.[12]

## III.

The Medical Center here calls upon the power of the court to authorize a change in the use of assets held in trust. Generally, of course one who holds property in trust is equitably bound to use the property in accord with the settlor's expressed intention. It is a basic function of equity courts to enforce this obligation. It has long been recognized, however, that it is not always possible to enforce a settlor's specific intention rigidly. Trusts are instruments that operate over long periods of time; their creators often cannot foresee changes that will impact upon the operation of the trust they create. Recognizing the risks of dysfunction that dynamic conditions thus pose, equity has recognized that changes in circumstances can give rise to a necessity to reformulate the duties of trustee in light of the settlor's in-

12. As an alternative theory, the objectors contend that it is premature to decide whether it has become "impossible or impractical" to provide convalescent care services at Pelleport. Such a determination, it is contended, could not fairly be made until the Medical Center decides which, if any, of the proposed alternative uses of Pelleport will be implemented.

tentions.[13] The purpose of this *cy pres* rule is to permit the best available realization of the donor's fundamental intention where unforeseen change threatens to cause the trust to fail in its fundamental purpose. *See, e.g., First National Bank and Trust Co. of Milford v. First National Bank and Trust Co.,* Del.Ch., 121 A.2d 296 (1956).

A leading authority describes the *cy pres* doctrine as follows:

> Where property is given in trust for a particular charitable purpose, the trust will not ordinarily fail even though it is impossible to carry out the particular purpose. In such a case the court will ordinarily direct that the property be applied to a similar charitable purpose.

4 Scott on Trusts § 399 (1967). Professor Scott continues as follows:

> Where property is given in trust for a particular charitable purpose, and it is impossible or impractical to carry out that purpose, the trust does not fail if the testator has a more general intention to devote the property to charitable purposes. In such a case the property will be applied under the direction of the court to some charitable purpose falling within the general intention of the testator.

*Id.* at § 399.2 (1967). The most rudimentary expression of a "test" for the application of this *cy pres* doctrine requires (1) that the settlor has evinced a general charitable intention; (2) that the particular purpose designated in the original gift has become "im-possible or impractical" of fulfillment; and (3) that the proposed alternative use must approximate as nearly as possible the settlor's general charitable intention. Those conditions are simply common sense, spun out.[14] In this instance the specific intention of the testamentary gifts was to facilitate the operation and growth of the planned Eugene and Amelia du Pont Memorial Hospital at Pelleport. That specific intention cannot be pursued at this time because the Medical Center has exercised its judgment to cease to operate that hospital. I cannot say from the evidence that it was impracticable for it to continue to operate Pelleport as a convalescent hospital, given the resources that Eugene du Pont's will made available and the estimated costs of improvements that would be necessary. But the Medical Center was under no legal obligation to continue to operate a convalescence facility at Pelleport; the 1951 and 1953 Agreements between the Homeopathic Hospital Association and Mr. du Pont acknowledged the Association's right to exercise its business judgment to cease doing so.

Indeed the testamentary gifts here in issue may be seen as a reflection of the fact that the Homeopathic Association had no obligation to continue indefinitely to operate the Hospital at Pelleport. Mr. du Pont, in his will, created two endowment funds that are designed to make that operation less burdensome and therefore more attractive. These funds serve as an inducement to continue to

---

**13.** Statutes which are also legal ˙constructs of great duration are different in this respect in that a body with amending power exists; the legislature can adjust the governing language of statutes to new conditions. It is the absence of a comparable authority that makes the *cy pres* doctrine necessary.

**14.** While the common law *cy pres* rule has been consistently articulated in the above fashion, the parties dispute whether the "general charitable intent" requirement survives in Delaware subsequent to the adoption of 12 *Del.C.* § 3541. This statute provides in pertinent part:

> If at any time during the administration of a charitable trust (whether testamentary or *inter vivos*) governed by the laws of this State, *the charitable purpose for which it was created becomes* indefinite or *impossible or impractical of fulfillment,* or if such a charitable purpose shall not have been fulfilled for want of a trustee or because of the failure of a trustee to designate such a purpose, then, absent an express provision to the contrary in the trust's governing instrument, *the Court of Chancery shall order the administration of the trust for such a charitable purpose,* or the distribution of the trust to such a charitable entity, *as fulfills as nearly as possible* the intention of the trust's creator, *whether his charitable intent was general or specific.* (emphasis added)

According to the applicant, this statute effectively eliminated the requirement that the settlor of a charitable trust affirmatively evince a general charitable intent for the *cy pres* power to be applied. I need not express an opinion on whether this statute has the effect of removing the common law requirement that a grantor has a general charitable intention, as I assume, without deciding, that such an intention was present here.

operate the charitable institution Mr. du Pont in effect created.

The Medical Center's decision to move its rehabilitative services from Pelleport to Wilmington Hospital was not, insofar as I can judge the matter from the record created, the result of the fact that operation at Pelleport was no longer financially feasible, but was the result of the determination that it was not optimal; another alternative simply appeared better. The Homeopathic Association had retained the right to make such a judgment. Thus, while respondents want the court to draw a negative inference from this fact, I cannot. The board of the Medical Center has a responsibility to try, in an informed and well motivated process, within the law, to provide high quality hospital and related health care services in a cost efficient manner. If it is more efficient for the Medical Center to provide rehabilitation services at Wilmington Hospital than at Pelleport, no obligation of the Medical Center arising from the acceptance by its predecessors of the Eugene du Pont gifts prevents it from doing so.

The Medical Center having exercised its right to remove the rehabilitation unit at Pelleport, it is now absolutely clear that the first test of the *cy pres* doctrine—inability to satisfy the specific intention of the settlor—is satisfied.

That fact being established the question then is whether the trust now fails (in which event the endowment funds would pass to the residuary trusts formed in Mr. du Pont's will) or whether alternatively it can be determined that Mr. du Pont intended (or rather would have intended, since the drafters of these instruments did not foresee all of this) that an alternative charitable effort be supported. For purposes of this proceeding, I assume that Mr. du Pont did have a general charitable motivation and that his preference would have been for the closest feasible charitable alternative to his specific stated intention. Thus, the final question is what alternative use of these funds falls closest to the frustrated goal of providing a convalescent hospital at Pelleport.

It seems evident that the actual intent of Mr. du Pont was highly specific and contained elements of general charitable motivation as well a desire to memorialize his parents in a specific way at a special location. I conclude that there were three important aspects of all of these gifts. First of these is the requirement that they be used to build, maintain or operate a substantial, handsome monument to his parents and his family. (Note, for example, not simply the references to his parents and to "my ancestral home" but note as well the expressed concern with "harmonious" buildings not "marring the appearance of the building now being there erected"). Second is the requirement that that monument be a living monument that contributes to the welfare of the community by providing useful health care or restorative services. And third is the fact that the living monument be erected on land occupied by his mother as her home. Thus I suppose that the most central aspect of this charitable project from Mr. du Pont's point of view was the monumental character of the charitable gift.

I cannot imagine that the rendering of convalescent care *per se* was the core motivation for these gifts, and I cannot conclude that the failure to provide convalescent care at Pelleport necessarily frustrates the central animating purpose of these grants.

The difficult question for the court is, given the Medical Center's decision to move the rehabilitation services to Wilmington, what alternative use of these endowment funds will come closest to achieving the over-arching motivation of Eugene du Pont?

As I believe that the central intention was to create at Pelleport a living monument to the grantor's family that would contribute in an on-going way to the welfare of the citizens of New Castle County, I cannot approve the expenditure of the Endowment Funds to underwrite the operation of the hospital's rehabilitation services at the Wilmington Hospital. That expenditure does not satisfy or come at all close to satisfying what I take to be the central motivation of these gifts. These testimonial funds were intended as a financial inducement or support to keep Pelleport operating as a convalescent hospital. If, as is the case, that specific goal

cannot be met, these funds should be available to underwrite alternative uses of this monumental facility so that it may in the future and for so long as it is feasible to do so, continue to benefit the public and to perpetuate the memory of those intended to be honored by it. Underwriting the operation of the rehabilitative facility at the Wilmington Hospital does not at this time appear to be sufficiently close to the central aspect of Mr. du Pont's gifts to serve as an acceptable substitute for the specified purpose, in my opinion.

The court need go no further on this application. Obviously the best use of this facility is a question of some complexity. Perhaps the Medical Center will or has come to see Pelleport as not only marginal to its mission but as a burden. Whatever resolution is to be proposed or imposed, it is, in my opinion, most consistent with Eugene du Pont's expressed wishes that these testamentary funds be related to the use of Pelleport. If in the end this is utterly impossible, new questions will be presented under the *cy pres* doctrine. But for the moment it is sufficient to express the opinion that expenditure of interest from the Endowment Fund to underwrite the cost of operation of the rehabilitation department at the Wilmington Hospital is not authorized under the *cy pres* doctrine and that expenditure of the Building Fund for undesignated purposes cannot be passed upon since the court has no means to judge whether such expenditures fall acceptably close to the frustrated intention of the grantor.

Therefore the petition will be denied. It is so Ordered.