In the Matter of the MARY
R. LATIMER TRUST
u/a/d 12/3/1924.

C.M. No. 17254–N–VCL.

Court of Chancery of Delaware.

Submitted: July 11, 2013.
Decided: Aug. 2, 2013.
Modified: Aug. 19, 2013.

Norris P. Wright, Gordon, Fournaris & Mammarella, P.A., Wilmington, Delaware; Attorney for Petitioner Wilmington and Brandywine Cemetery.

Harold W.T. Purnell, II, Archer & Greiner, P.C., Georgetown, Delaware; Attorney for Petitioner PNC Bank, N.A.

## OPINION

LASTER, V.C.

The Wilmington and Brandywine Cemetery (the "Cemetery") and PNC Bank, N.A. (the "Trustee") petitioned to modify a trust established for the maintenance of two burial lots (the "Trust"). Contending that the Trust has a charitable purpose, they relied on the common law doctrine of cy pres, Delaware's statutory codification of the cy pres doctrine, and the common law doctrine of deviation. The petition is denied.

## I. FACTUAL BACKGROUND

Mary R. Latimer (the "Settlor") established the Trust pursuant to an agreement dated December 3, 1924, among the Settlor and the predecessors to the current Trustee (the "Trust Agreement" or "TA"). The Settlor funded the Trust with $5,000 to be used only for the "uses, intents, purposes and trusts" set forth in the Trust Agreement. TA at 1.

The Trust Agreement provides that the corpus will be held in trust and invested "in some safe and productive securities, with power from time to time, in [the Trustee's] discretion to call in and reinvest the same, as may be necessary." TA at 1. The Trustee is authorized to deduct from the gross income "the costs, taxes and expenses of conducting the trust, including a reasonable compensation for their services as such trustee, not to exceed five

per cent (5%) of the gross income arising from the said trust fund." *Id.* The Trust Agreement directs the Trustee

> to apply the net income, so far as may be necessary, for the perpetual care and renewal when necessary of the vaults and monuments, the iron fence railing and steps upon and around lots known as # 29 and # 30, Section 13 in the Wilmington and Brandywine Cemetery, in the City of Wilmington, Delaware, covered by certificate # 221, now standing in the name of Henry Latimer, and including in particular when necessary the renewal of the said iron fence and railing from time to time when and as the same shall disintegrate and in the judgment of the said trustees require replacement.

*Id.* To the extent there is excess income, the Trust Agreement directs the Trustee

> to permit whatever excess of income shall remain from year to year over and above the amount required to carry out the purposes hereinbefore expressed in this trust to accumulate, so as to provide for the renewal and replacement, as shall be required in the coming years, of the vaults, monuments, iron fence railing, and to provide further for the defence [sic], if needful against any attempt to condemn the property for any purpose whatsoever and to remove the bodies from this lot to another location.

*Id.* at 1–2.

The Trust Agreement thus calls for the Trust's net income to be used to maintain lots # 29 and # 30 (the "Burial Lots") and their immediate surroundings in the Cemetery. The Trust Agreement instructs that excess net income shall "accumulate" to be used (i) "for the renewal and replacement ... of the vaults, monuments, [and] iron fence railing," (ii) "for the defence [sic], if needful, against any attempt to condemn the property for any purpose

whatsoever," and (iii) if that defense is unsuccessful, "to remove the bodies" from the Burial Lots "to another location."

The Cemetery has operated in Wilmington, Delaware since 1848. It houses more than 22,000 interments, including noted Delawareans such as Delaware's first governor, Dr. John McKinley, and philanthropist and chemist Harry Fletcher Brown. The Cemetery boasts stands of Flowering Dogwood, Sassafras, Northern White Cedar, and Sweetgum trees believed to be the largest in Delaware.

The Cemetery currently operates at an annual deficit. Because of its endowment, the Cemetery is not presently in financial danger, but it could face difficulties in a decade or so. Acting with prudent foresight, the Cemetery's board of directors has sought to address the annual deficit. As part of that process, the Cemetery identified the Trust as a potential source of funds. Through the petition, the Cemetery asks the Court to modify the Trust "to direct that three percent (3%) of the net asset value of the Trust be distributed annually to [the] Cemetery for the purposes stated in the Trust as well as for the general maintenance of [the] Cemetery." Petition ¶ 29. The Trust's value in February 2013 was approximately $500,000. Taking three percent from the Trust would yield approximately $15,000 annually for the Cemetery. This amount would go a long way towards addressing the annual deficit.

The Cemetery contends that the modification is appropriate because the Trust's income is "well in excess" of what is needed to maintain the Burial Lots. *Id.* ¶ 20. In the last ten years, the Trustee disbursed $13,070.50 on one occasion to maintain the Burial Lots and their surrounding features. The Cemetery represents that it would cost $10,000 to remove and relocate the remains in the Burial Lots should the

need arise. As further support for the modification, the Cemetery argues that the iron railing and areas surrounding the Burial Lots are actually not located on the Burial Lots but on land belonging to the Cemetery.

Historically, the Cemetery has not allocated any maintenance expense to the Trust, claiming that it is "difficult to determine just what amount of the overall maintenance costs for the Cemetery should be allocated." Dkt. 1 at 1. The Cemetery did not identify any methods that have been tried. A relatively obvious and straightforward approach would be to allocate to the Trust its *pro rata* share of maintenance and grounds-keeping expenses calculated using a reasonable ratio, such as the ratio of the Trust's two interments to the total number of interments (2/22,000), the ratio of the land area covered by the Burial Lots and their surrounding features to the total land area of the Cemetery, or the ratio of certificates held by the trust (one) to total certificates issued by the Cemetery. Doubtless minds more familiar with the details of the situation could devise other reasonable methods. I suspect none of these methods would result in an allocation approaching a unitrust deduction of 3% of the Trust's net asset value per year.

In essence, the petition asks the Court to deploy its supervisory powers over trusts as an equitable Robin Hood. If the modification is approved, a Trust that the Settlor funded to maintain two burial lots will end up subsidizing a cemetery with 22,000 interments.

## II. LEGAL ANALYSIS

The petition seeks to modify the Trust pursuant to common law cy pres, statutory cy pres, and the common law doctrine of deviation. None supports modification.

### A. Common Law Cy Pres

The Delaware courts first applied common law cy pres in 1948. *See Del. Trust Co. v. Graham,* 61 A.2d 110, 113–14 (Del. Ch.1948); *see also* E.L. Fisch, *Cy Pres Comes to Delaware,* 9 Md. L.Rev. 359, 359 (1948). In 1979, the Delaware General Assembly established a statutory version of cy pres as part of the Trust Act. *See* 12 *Del. C.* § 3541. The General Assembly did not indicate to what degree statutory cy pres displaced common law cy pres, leading this Court to observe that "[i]t is unclear to what extent [statutory cy pres] is meant to abrogate the Delaware common law doctrine of *cy pres.*" *See PNC Bank, Del. v. N.J. State Soc. for Prevention of Cruelty to Animals,* 2008 WL 2891150, at *7 n. 18 (Del.Ch. July 14, 2008) (citing *In re Estate of du Pont,* 663 A.2d 470, 478 n. 14 (Del.Ch.1994)). Because of the lack of clarity and the petitioners' invocation of common law cy pres, this decision analyzes it.

■■■ Cy pres is a French phrase meaning "as near." At common law, the doctrine contemplated that

> where the general charitable purpose of a trust would fail due to a circumstance, unanticipated by the settlor, that renders the literal fulfillment of the trust impossible or impractical, the court may designate an alternative beneficiary "*cy pres*" (as near as may be) to the named beneficiary, to facilitate the settlor's general intent.

*PNC Bank, Del.,* 2008 WL 2891150, at *6. If, however, the settlor's "particular intent remain[s] possible, the bequest will be so applied. The general intention is of the last resort." S.A. Anderson, *The Cy Pres Doctrine as Affecting the Construction of Deeds and Wills,* 1 Colum. L.T. 8, 12 (1887) (citation omitted). A court will not invoke common law cy pres "merely be-

cause some imaginary benefit is anticipated from giving latitude to the language of the written instrument, or on any bare suggestion of expediency." *Id.* Only when it becomes "absolutely impossible to accomplish the particular purpose" of the trust will cy pres empower a court to craft an imperfect solution to make the trust functional. *Id.*

■■■ Common law cy pres can only be applied to a charitable trust. "[A] trust may be created for charitable purposes ... or for private purposes, or for a combination of charitable and private purposes." Restatement (Third) of Trusts § 27(1) (2003) [hereinafter Restatement of Trusts]. "Cy pres has no application to private trusts...." Ronald Chester, George Gleason Bogert & George Taylor Bogert, *The Law of Trusts and Trustees*, § 431, at 118 (3rd ed. 2005) [hereinafter *The Law of Trusts];* *accord* Restatement of Trusts § 67 cmt. a (same).

■■■ A charitable trust is, profoundly, a trust that has a charitable purpose. "No completely satisfactory definition of charitable purpose exists." Mary Kay Lundwall, *Inconsistency and Uncertainty in the Charitable Purposes Doctrine,* 41 Wayne L.Rev. 1341, 1348 (1995). One of the earliest sources of authority is the preamble to the Statute of Charitable Uses, an English statute enacted in 1601 that identified twenty-one purposes considered charitable at the time. Its list included

> relief of aged, impotent and poor people, ... maintenance of sick and maimed soldiers and mariners, schools of learning, free schools, and scholars in universities, ... repair of bridges, ports, havens, causeways, churches, sea-banks and highways, ... education and preferment of orphans, ... relief, stock or maintenance for houses of correction, ... marriages of poor maids, ... sup-

portation, aid and help of young tradesmen, handicraftsmen ... and others for relief or redemption of prisoners or captives, and for aid or ease of any poor inhabitants concerning payments of fifteens, setting out of soldiers and other taxes....

*Id.* (quoting 43 Eliz. Ch. 4 (Eng.1601)). A twentieth-century definition frames a charitable purpose as

> the attempt in good faith, spiritually, physically, intellectually, socially and economically to advance and benefit mankind in general, or those in need of advancement and benefit in particular, without regard to their ability to supply that need from other sources and without hope or expectation, if not with positive abnegation, of gain or profit by the donor or by the instrumentality of the charity.

*Id.* at 1349 (citing *Planned Parenthood Ass'n v. Tax Comm'r,* 5 Ohio St.2d 117, 214 N.E.2d 222, 225 (Ohio 1966)). The Restatement of Trusts identifies certain unquestionably charitable purposes that have stood the test of time, including:

> (a) the relief of poverty;
>
> (b) the advancement of knowledge or education;
>
> (c) the advancement of religion;
>
> (d) the promotion of health;
>
> (e) governmental or municipal purposes; and
>
> (f) other purposes that are beneficial to the community.

Restatement of Trusts § 28. The Restatement of Trusts explains that a trust is charitable if it serves a purpose "of such social interest or benefit to the community as to justify permitting [the corpus] to be devoted to the purpose in perpetuity and to justify other special privileges that are typically allowed to charitable trusts." *Id.* cmt. a; *see also The Law of Trusts, supra,*

§ 362, at 19–20 ("A fundamental distinction between private and charitable trusts lies in the character of the benefits.... In charitable trusts, the benefits to be provided through the trust are to be intangible advantages to the public or some significant class thereof....").

Trusts to maintain burial sites date back at least to the mid–1800s. *See* James T. Brennan, *Bequests for the Erection, Care, and Maintenance of Graves, Monuments, and Mausoleums,* 9 Washburn L.J. 23, 25–30 (1969) [hereinafter *Bequests* ] (discussing English and American cases). Originally, courts held burial site trusts invalid because they lacked a human beneficiary and typically had a perpetual existence, thereby running afoul of longstanding trust law doctrines. *See id.* at 28 (discussing policies against indefiniteness, lack of a human beneficiary, and restraints on alienation, and violations of the rule against perpetuities); *see also Del. Trust Co. v. Del. Trust Co.,* 95 A.2d 569, 575 (Del.Ch. 1953) (Seitz, C.) (noting that a burial site trust "for an indefinite period was invalid [at common law] as violating the rule against perpetuities."). To address these problems, many states, including Delaware, enacted statutes declaring burial site trusts valid and not constrained by the rule against perpetuities. *See* 12 *Del. C.* § 3551(b) (originally enacted in 1935, *see Del. C.* 1935, § 3964); *The Law of Trusts, supra,* § 377, at 183–84.

▆ The Delaware statute authorizing burial site trusts describes them as noncharitable trusts. *See* 12 *Del. C.* § 3551 (Section 3551 is a part of Subchapter IV of the Trust Act, titled "Trusts for Cemeteries and Other Noncharitable Purposes"); *see also* Adam J. Hirsch, *Delaware Unifies the Law of Charitable and Noncharitable Purpose Trusts,* 36 Estate Planning 13, 16 (2009) [hereinafter *Noncharitable Purpose Trusts* ] (recognizing that by statute, cemetery trusts in Delaware are noncharitable). This statutory characterization comports with the majority rule at common law. "A bequest for the erection or maintenance of a tomb or monument does not ordinarily create a charitable trust." William F. Fratcher, *Scott on Trusts,* § 374.9, at 234 (4th ed. 1989) [hereinafter *Scott on Trusts];* accord *Del. Trust Co.,* 95 A.2d at 575 ("Under the common law it was quite generally held that a trust [to maintain family burial lots] was not charitable ...."); *see also The Law of Trusts, supra,* § 377, at 176–77 & n. 6 (collecting cases from numerous jurisdictions for proposition that "[t]he court of chancery, where not controlled by statute, has not regarded a trust for the construction ... or the upkeep of a private burial plot or cemetery as charitable"); *Bequests, supra,* at 38 (explaining that "a bequest for the perpetual care of the donor's or his family's grave" is "[o]rdinarily ... of no particular public interest or benefit"). Only a minority of jurisdictions held otherwise and treated burial site trusts as charitable. *See The Law of Trusts, supra,* § 377, at 181 ("In a few states the view has been maintained that a trust for the perpetual care of a private grave ... is a charitable trust.").

▆ Burial site trusts can be considered charitable under certain circumstances. Trusts established for the creation or general maintenance of an entire public or church cemetery are charitable because of the accompanying public or religious benefit. *See Scott on Trusts, supra,* § 374.9, at 235; *see also Anderson v. Mount Zion Cemetery Ass'n,* 184 A.2d 86, 89 (Del.Ch.1962) (noting that the donation of land for a church cemetery would be charitable "because of the religious purpose thereby intended"); *The Law of Trusts, supra,* § 377, at 178, 181 (same). Likewise, a trust created to establish or maintain a tomb of a famous person may

be charitable by virtue of a perceived community benefit. *See Scott on Trusts, supra*, § 374.9, at 234.

Absent distinguishing factors, this Court has held that a trust created to maintain individual burial lots has a noncharitable purpose. In *Security Trust Co. v. Willett*, Chancellor Seitz considered a petition challenging the validity of and otherwise seeking to modify a trust. 97 A.2d 112 (Del.Ch.1953) (Seitz, C.). The trust agreement provided for its net income to "be applied forever for the maintenance of certain family cemetery lots." *Id.* at 112. The Chancellor initially declared that the trust was not subject to the rule against perpetuities and therefore valid. *Id.* He then rejected petitioners' request for modification under common law cy pres, noting that while the trust was "akin" to a charitable trust, it was in fact a "perpetual private" trust. *Id.* at 113. As Chancellor Seitz explained, "[t]his was a trust to maintain specific family burial lots and grave stones. Nothing in the will or the surrounding circumstances suggests a general charitable intent. The doctrine of cy pres has no application." *Id.*

Nearly ten years later, this Court confronted the argument that trusts supporting cemeteries have an inherently charitable purpose. *See Anderson v. Mount Zion Cemetery Ass'n*, 184 A.2d 86 (Del.Ch.1962). Members of the defendant cemetery association challenged a plan to sell an unused portion of the cemetery's property, arguing that the land was subject to a charitable trust that prevented its sale. They advocated a broad rule, *contra Willett*, that "land devoted to cemetery purposes must be treated in law as the subject matter of a charitable trust.... That is said to be required because of the public interest involved in the interment of the dead." 184 A.2d at 89. This Court rejected the argument, holding that while burial

lots are protected as a matter of a public policy, a trust to maintain those lots is not inherently "charitable."

The petition represented that the Trust was a charitable trust. The petition did not cite Section 3551 or the decisions in *Willett* and *Anderson*. After the Court inquired about the nature of the Trust, counsel provided a supplemental submission observing that some other states treat burial plot trusts as charitable trusts. That is true, but the Trust was created in Delaware, the Settlor and initial trustees were Delaware citizens, the Burial Lots are located in Delaware, the Trust has been administered under Delaware law since its inception, and the current Trustee is a corporate trustee with its principal place of business in Delaware. Delaware law controls.

 Under Delaware law, the Trust is not a charitable trust. It provides for the preservation and maintenance of two specific burial lots and their immediate surroundings. Like the trusts in *Willett* and *Anderson*, the Trust's purpose is to benefit the Burial Lots. Because the Trust is a private trust, common law cy pres is unavailable.

### B. Statutory Cy Pres

The Delaware General Assembly codified the doctrine of cy pres in 1979 under the rubric of judicial modification. *See* 12 *Del. C.* § 3541. In 2007, the Delaware General Assembly amended Section 3541 to expand the coverage of judicial modification to noncharitable trusts. In doing so, the General Assembly appears to have followed the lead of the Uniform Trust Code, which contemporaneously moved in a similar direction. *See* Unif. Trust Code §§ 412–413; *see also* Adam J. Hirsch, *Trusts for Purposes: Policy, Ambiguity, and Anomaly in the Uniform Laws*, 26 Fla. St. U.L.Rev. 913, 948 n. 153 (1999).

Section 3303(a) states that the policy of the Delaware Trust Act is "to give maximum effect to the principle of freedom of disposition and to the enforceability of governing instruments." 12 *Del. C.* § 3303(a). Section 3303(b) of the Trust Act applies this policy to modifications of a Trust's purpose:

> In furtherance of and not in limitation of the provisions of subsection (a) of this section, the terms of a governing instrument of a trust established and existing for religious, charitable, scientific, literary, or educational purposes *or for noncharitable purposes* shall not be modified by the court to change the trust's purposes unless the purposes of the trust have become unlawful under the Constitution of this State or the United States or the trust would otherwise no longer serve any religious, charitable, scientific, literary, educational, *or noncharitable purpose*, in which case the court shall proceed in the manner directed by § 3541 of this title.

12 *Del. C.* § 3303(b) (emphases added). Section 3541 is the section that authorizes judicial modification.

Section 3541 reiterates the conditions precedent to modification set forth in Section 3303(b). In its current form, Section 3541 states:

> (a) Subject to subsection (b) of this section, if a particular charitable purpose or noncharitable purpose becomes unlawful under the Constitution of this State or the United States or the trust would otherwise no longer serve any religious, charitable, scientific, literary, educational, or noncharitable purpose:
>
> > (1) The trust does not fail in whole or in part;
> >
> > (2) The trust property does not revert to the trustor or the trustor's successors in interest; and

> (3) The Court of Chancery shall modify or terminate the trust and direct that the trust property be applied or distributed, in whole or in part, in a manner consistent with the trustor's charitable or noncharitable purposes, whether or not such purposes be specific or general.
>
> (b) The power of the Court of Chancery to modify or terminate a charitable or noncharitable purpose trust, as provided in subsection (a) of this section, is in all cases subject to a contrary provision in the terms of the trust instrument, whether such contrary provision directs that the trust property be distributed to a charitable or noncharitable beneficiary.
>
> (c) For purposes of this section, a "noncharitable purpose" is a purpose within the meaning of § 3555 or § 3556 of this title.

12 *Del. C.* § 3541.

Sections 3303(b) and 3541 thus prescribe a two step inquiry before judicial modification can take place. Initially, the court must determine whether (i) the trust's purpose has become unlawful or (ii) the trust does not otherwise serve "any . . . noncharitable purpose." 12 *Del. C.* § 3541(a). If so, then the court next must evaluate whether the settlor contemplated the particular contingency and provided for it. *See* 12 *Del. C.* § 3541(b). The court only may modify or terminate a trust if the first inquiry is met *and* the trust instrument does not address the contingency. *Id.; see PNC Bank, Del.*, 2008 WL 2891150, at *7.

As a threshold matter, petitioners cannot rely on judicial modification because Section 3541(c) limits its use to noncharitable trusts having "a purpose within the meaning of § 3555 or § 3556 of this title." 12 *Del. C.* § 3541. Section 3555 authorizes trusts for the care of an animal.

*See* 12 *Del. C.* § 3555. Section 3556 authorizes trusts for "Other Noncharitable Purposes." 12 *Del. C.* § 3556. The section authorizing burial lot trusts is Section 3551(b). *See* 12 *Del. C.* § 3551(b). By its terms, Section 3541 does not authorize judicial modification of burial lot trusts.

▇▇▇▇ Assuming Section 3541 did apply, the petitioners could not get past the first step. They do not allege that the Trust's purpose has become unlawful or that the Trust no longer serves "any . . . noncharitable purpose." Rather, they suggest that because of the anticipated financial deterioration of the Cemetery over the course of the next decade, the Trust no longer serves "its" purpose. Petition ¶ 31. But the possible future financial embarrassment of the Cemetery does not mean that the Trust's purpose is unlawful or that the Trust fails to serve "any . . . noncharitable purpose." 12 *Del. C.* § 3541. The Trust indisputably has a lawful, statutorily authorized purpose. *See* 12 *Del. C.* § 3551. It continues to serve that noncharitable purpose. The petitioners' real beef is that the Trust does not serve the purpose they prefer. Instead of serving the purpose of maintaining the Burial Lots, they would like the Trust to serve the purpose of maintaining both the Burial Lots and the Cemetery as a whole. The Cemetery's preference does not provide a valid basis for statutory modification.

▇▇▇▇ The fact that the Trust is amply funded does not provide a basis for statutory modification either. At common law, a court could invoke cy pres to modify a charitable trust that held excessive funds for its purpose. *See* Mark S. Dennison, *Circumstances Warranting Application of Cy Pres Doctrine to Modify Terms of Charitable Trust*, 88 Am.Jur. Proof of Facts 3d 469 § 15 (2013); Restatement of Trusts § 67 (contemplating cy pres for a charitable trust "to the extent it is or

becomes wasteful to apply all of the property to the designated purpose"). The provisions of the Uniform Trust Act that authorize modification of noncharitable trusts and statutory cy pres for charitable trusts both contemplate judicial intervention where continuing the *status quo* would be "wasteful." *See* Unif. Trust Code § 412(b) (authorizing modification of a noncharitable trust "if continuation of the trust on its existing terms would be impracticable or wasteful or impair the trust's administration"); *id.* § 413 (authorizing statutory cy pres "if a particular charitable purpose becomes unlawful, impracticable, impossible to achieve, or wasteful"). In crafting Delaware's statute, the General Assembly adopted a single provision authorizing judicial modification of both charitable and noncharitable trusts and did not incorporate the concepts of excessive funding or wastefulness. Under the Delaware provision, this Court's statutory power to modify a trust turns only on whether the trust is unlawful or no longer serves "any" charitable or noncharitable purpose. *See* 12 *Del. C.* § 3541(a); *Noncharitable Purpose Trusts, supra,* at 18 ("[T]he Delaware statutes include no provision covering trusts against public policy. Nor does the section authorizing noncharitable purpose trusts contain any language curtailing extravagant funding.").

By declining to authorize judicial modification because of excessive funding or wastefulness, the General Assembly enacted a provision that comports with Delaware's statutory policy of giving "maximum effect to the principle of freedom of disposition and the enforceability of governing instruments." 12 *Del. C.* § 3303(a). That policy choice results in a provision that does not aid the petitioners.

Consequently, if the statute applied, then the petition would fail the first step in the statutory analysis. Had it passed the

first step, it would fail the second. The petitioners argue that the Trust's purpose could become impossible to achieve because the Cemetery someday could "fall into disrepair and cease operating without additional sources of funding." Petition ¶ 18. Setting aside the contingent nature of these concerns, the Settlor contemplated the possibility that the Burial Lots might be threatened or that the bodies might need to be moved. The Trust Agreement provides that excess net income shall "accumulate" to be used, if necessary, to defend "against any attempt to condemn the property for any purpose whatsoever" and "to remove the bodies" from the Burial Lots "to another location." TA at 2. If events come to pass that threaten the Burial Lots, then the Trustee can use the accumulated net income of the Trust to defend the Burial Lots. If the defense fails, then the Trustee can use the accumulated net income to move the bodies to another location.

Beyond the plain language of the Trust Agreement, the record does not provide insight into the Settlor's intentions. A Settlor with a more communitarian bent might have provided that excess net income or even the corpus itself could be deployed to maintain and, if necessary, defend the Cemetery. This Settlor did not adopt that stance, preferring the individualist approach of concentrating her beneficence on the Burial Lots. In her own way, she provided for the circumstance that the Cemetery anticipates, obviating any basis for statutory modification.

 As their final argument in favor of modification, the petitioners note that the Trust Agreement is "silent with respect to the distribution of Trust assets in the event the bodies interred in the [Burial Lots] have to be moved to another location." Petition ¶ 10. True. Should that possibility come to pass, then judicial mod-

ification might be appropriate. But the issue currently need not be confronted. For the present, the purpose of the Trust remains lawful, and the Trust is fulfilling a valid noncharitable purpose. Judicial modification is therefore currently unavailable.

## C. The Doctrine Of Deviation

 The common law doctrine of deviation allows deviation from the literal terms of a trust "where compliance is impossible or illegal, or where owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust." *Bank of Del. v. Buckson*, 255 A.2d 710, 716 (Del.Ch.1969) (quoting *Scott on Trusts, supra*, § 381); *see* 12 *Del. C.* § 3306 (preserving common law doctrine of deviation). For the reasons discussed in the previous section, compliance with the literal terms of the Trust is not impossible or illegal. *See* Part II.B, *supra*. To the extent the need to protect the Burial Lots arises in the future, the Settlor anticipated those circumstances and dictated how the Trustee should proceed. The doctrine of deviation is therefore not available either.

## III. CONCLUSION

The Court sympathizes with the desire of the Cemetery's board of directors to shore up that institution's finances and thereby benefit the broader community that the Cemetery serves. The Settlor, however, created the Trust lawfully to preserve and maintain the Burial Lots. She had the power to dispose of her property for that purpose, and it is the public policy of this State "to give maximum effect to the principle of freedom of disposition and to the enforceability of governing instruments." 12 *Del. C.* § 3303(a). The peti-

tion does not provide any basis for modify-
ing the Trust. It is denied.